**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**GREAT AMERICAN INDUSTRIES, INC., Walter S. Mack, Jerome Matusow, Frederick J. Pagnani, William Thomas Beard, Emanuel Lester, Odie R. Seagraves, Bernard D. Marren, Irving Stolz, Adam Mele, Defendants.**

**No. 60 Civ. 1734.**

United States District Court
S. D. New York.

Oct. 4, 1966.

ther alleged violations of Section 10(b) and Rule 10b–5; three defendants, Mack, Marren and Stolz, from further alleged violations of Section 13(a) and Rule 13a–11; and two defendants, Stolz and Mele, from further alleged violations of Section 16(a) and Rule 16a–1 of the SEA of 1934. The Commission also seeks a mandatory injunction directing Mack, Marren, Stolz [1] and Mele to comply with the provisions of the sections claimed to have been violated.

Walter P. North, Washington, D. C., David P. Bicks, New York City, N. Y., Leonard H. Rossen, Washington, D. C., Frederic C. Jacobs, Philadelphia, Pa., Meyer Eisenberg, Joel J. Rabin, David J. Myerson, Washington, D. C., and Stanley Sporkin, Philadelphia, Pa., for plaintiff.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendants, Great American Industries, Inc., Walter S. Mack, Bernard D. Marren and Irving Stolz, Simon H. Rifkind, Richard Paul, and Thomas R. Farrell, Jr., New York City, Purcell & Nelson, Ganson Purcell, Washington, D. C., of counsel.

Rogge, Wright, Rogge & Wiener, New York City, for defendant, Jerome Matusow, O. John Rogge, New York City, of counsel.

Walter Feldesman, New York City, for defendant, Frederick J. Pagnani, Justin W. D'Atri, New York City, of counsel.

Leinwand, Maron & Hendler, New York City, for defendant, William T. Beard, Isidor E. Leinwand, New York City, of counsel.

Irving Fliegler, New York City, for defendants, Emanuel Lester and Odie R. Seagraves.

Rogers, Hoge & Hills, New York City, for defendant, Adam Mele, Alfred P. O'Hara, New York City, of counsel.

## OPINION

RYAN, Chief Judge.

In this action the Commission seeks to enjoin all but defendant Mele from fur-

Section 10(b) and Rule 10b–5, known as the anti-fraud sections of the Act, declare unlawful among other things the making of any untrue statement of a material fact necessary in order to make the statements not misleading in connection with the purchase and sale of a security. The Commission charges that violation of this Section and Rule occurred when the defendants Matusow, Pagnani, Beard, Lester and Seagraves, "the finder-defendants", together with and aided by the defendants Mack (chairman of the board), Marren (financial vice president and a director), and Stolz (general counsel and a director), "the corporate-defendants", in a series of transactions involving the purchase by Great American Industries, Inc. (GAI) of mining properties, obtained and attempted to obtain from GAI for little or no consideration a substantial number of the shares of GAI common stock paid or to be paid by GAI for the purchase by it of these mining properties. It is charged that in connection therewith the "finder defendants" made false and misleading representations to GAI concerning the true worth and potential of the mining properties while the "corporate defendants" caused GAI to prepare and issue press releases and to file with the Commission and the American Stock Exchange periodic reports on Form 8–K which were false and misleading. These press releases and filings it is charged were designed to and had the effect of (1) concealing from GAI and its

---

1. At the hearing held by the Court on this application, after a reading of Stolz's affidavit in opposition, the Commission withdrew without prejudice, its motion for injunctive relief against defendant Stolz from further violations of Section 16(a) and Rule 16a–1.

shareholders the unlawful diversion of GAI common stock from the company to the "finder-defendants" and (2) causing the price of GAI common stock on the American Stock Exchange to rise and thereby increase the value of GAI common stock to be issued to and owned by these defendants. This was done, it is said, with respect to three transactions: (1) the acquisition of an option on certain California sulphur properties; (2) the acquisition of certain Arizona copper properties; and (3) the entry into a contract for the purchase of certain Nevada sulphur properties. Essentially, the SEC contends that these acquisitions were obtained by the issuance of substantial quantities of GAI stock and that the owners of the properties involved received a relatively small amount of such stock, the remainder going to alleged "finders".

The alleged violations of Section 13(a) and Rule 13a–11—which Section and Rule require that every issuer of listed securities file periodic reports on 8–K forms recording events relating to corporate affairs—occurred according to the Commission when the corporate-defendants filed the 8–K reports above mentioned.

The alleged violation of Section 16(a) and Rule 16a–1—which Section and Rule require that every officer or director file a statement with the Exchange showing any change in ownership of a security during any one month—occurred when defendant Mele, vice president and treasurer and a director of GAI, failed to file a statement showing a purchase of 2,000 shares of GAI stock on January 12, 1966.

To place this action and this motion in proper perspective it is necessary to spell out what is not charged by the Commission.

It is not charged that the corporate-defendants were to receive any part of the shares issued in payment of the properties acquired and allocated to the "finder-defendants". It is not charged that the sale or contract of sale and the issuance of securities to the Seller of the properties and the other defendants was not a bona fide sale but a mere vehicle for the issu-ance of GAI shares to the Seller and the "finder-defendants". Most important, it is not charged that the property acquired in exchange for the shares issued was not worth the value of the shares which were issued in payment therefor. In fact, this is emphasized by the Commission when it says:

"It is our position that the true value of the mining properties in question is not an issue before this Court. We do not know nor do we allege that these properties are without any value. In the same manner that we do not know the value or potential of the properties, neither do the defendants. It is simply our position that the defendants had no basis in fact for making the statements they did about the properties."

It is charged that "since a substantial disproportionate amount of the company's shares would be diverted to persons who were not owners of the properties" defendants were engaged "in the systematic syphoning off from the company of large blocks of its common stock for little or nominal consideration" in fraud of the issuer. It is also charged that exaggerated claims made by defendants were in fraud of the investing public.

The documentary facts are not in dispute. As charged, the shares of GAI stock were issued or contracted to be issued in the amounts stated in exchange for the properties named. The 8–K Forms and the press releases did report what the Commission charges they did. What is in dispute are the inferences of illegality drawn from these admitted actions by the Commission and its characterization of defendants' conduct as fraudulent and violative of the Statutes involved. In addition, defendants contend that in order to impute fraud to them, the Commission on this motion has done exactly what it has accused them of doing. Defendants charge the Commission has misstated or omitted to state in its papers facts which were known or should have been known to the Commission through its investigation, and which would negate and destroy the

inferences drawn by it. Defendants also charge that the Commission has failed to make even a prima facie showing of defendants' guilt of the violations alleged, and that any injunction would be not only unwarranted and unnecessary and an injustice to the defendants but would be more harmful than beneficial to the public.

The historical background of this action is as follows:

According to the Commission, GAI first came to the attention of its investigative staff members during the period between January 13, 1966, the date GAI first issued a press release concerning its acquisition of an option to buy a sulphur property in California, and March 21, 1966, the date GAI issued a press release concerning further developments on the California property and its acquisition of an option to buy a copper property in Arizona. Trading in the shares of GAI on the American Stock Exchange rose from a volume on January 11, 1966 of 53,-400 to a volume on March 21, 1966 of 352,100, and the price of the shares increased from a low of 1¾ on January 11, 1966 to a high of 9 on March 21, 1966.[2]

The press release issued by the company on March 21, 1966 described the Arizona mining property as a "new mining strike of copper, silver, and gold ore", a "new discovery", a "mine" which would be "in production within 90 to 120 days".

This is the first press release which the Commission says was false and misleading. It has not quoted the full text nor submitted the release in evidence.

At about this time, a report on Form 8–K dated February 14, 1966, covering the month of January 1966, had been filed with the Commission wherein it was reported that GAI had acquired an option to acquire mining claims in California the purchase price of which were 1,600,000 shares of its common stock, plus $250,000 in cash. This is the first 8–K report charged by the Commission to be false and misleading, in that it did not disclose that a substantial part of the shares were to go to "finders" rather than the owner. It has not been fully quoted nor attached as an exhibit.

To continue, the staff, it is claimed, ascertained on inquiry into this market that a number of reports and rumors were circulating in the financial community concerning the value and potential of the proposed mining property acquisitions. When it determined, after speaking with GAI management and through other investigative efforts, that in its opinion no factual basis existed for the reports and rumors and that no justification existed for the rapid rise in the price and volume of GAI shares, the Commission suspended trading in GAI's common stock on March 31, 1966. The Commission states that the purpose of the suspension was to permit clarification of the reports and rumors then circulating.

On April 12, 1966, after discussions with the staff, GAI, at the urging of the staff, issued a release "clarifying" that of March 21, 1966, as follows:

" * * * It is not now known whether or not there is a commercially mineable ore body at the property. The Company has no reports establishing the existence of such an ore body (at the Arizona property). Only limited exploratory work has been done thus far, and further exploration is intended."

The trading ban was lifted on April 15, 1966, and trading was resumed.

The Form 8–K report, dated April 11, 1966, covering the months of February and March 1966, and received by the Commission on April 13, 1966, did not in its opinion conform to this press release of April 12, 1966 in that it referred to the property as a "mine" and indicated that it could be operating within "90 days", and anticipated that it might be operating at profits ranging from $50,-000 per month to $3,000,000 per year. When the Commission expressed its dissatisfaction with this statement and pointed this out to defendants, the fol-

---

2. We have taken the quotations from the Commission's affidavits.

lowing day, April 14, 1966, an amended report was filed, which stated:

" * * * It is not now known whether or not there is a commercially mineable ore body at the property. The Company has no reports establishing the existence of such an ore body. Only limited exploratory work has been done thus far, and further exploration is intended. * * * "

This amended report was not disclosed to the Court by the Commission in its original papers or in its argument. It was only after defendants had brought it out that the Commission referred to it in its reply brief.

This report also contained a statement that on April 5, 1966 GAI had acquired all the stock of the Arizona corporation "in exchange for 200,000 shares of GAI, Inc. common stock."

This is the second 8–K report which the Commission points to as false and misleading, in that it failed to disclose the substantial participation of finders in the shares received by the owner. Again, it has not been quoted in full or evidenced by an exhibit.

It appears that within the week after trading was resumed the price rose from a low of 11 on April 15, 1966 to a high of 14⅝ on April 20, 1966. During the following week, however, the price fell to a low of approximately 8 on April 26, 1966.

On April 27, 1966 GAI issued another press release concerning all three properties, the California, the Arizona and Nevada mines. It stated as to the first that:

"additional drilling and exploratory work is now being carried on by the mine owners on the 340 acres of sulphur bearing deposits in California under option to Great American but results on this work will not be available for about 60 days";

as to the second that:

"With regard to the copper and silver property called Copper Stack Mines recently purchased by Great American in Arizona, Mr. Mack stated that the machinery and equipment was now being ordered which should put this property into production in about 90 days";

and as to the third that:

"Great American Industries, Inc., through its chairman, Walter S. Mack, just announced that it purchased 20 mining claims covering approximately 3,500 acres containing elemental sulphur deposits in the Kamma Mountains, Humboldt County in Nevada, for 300,000 shares of Great American Industries common stock, which are to be taken by the sellers for investment and not for public distribution."

This is the second press release charged by the Commission to be false and misleading.

When the Commission's staff complained, a further release was issued, on April 28, 1966, which read in part:

"With regard to the California sulphur claims on which Great American acquired the purchase option in January, 1966, the engineering firms of Behre Dolbear & Co., and Arthur D. Little Inc., have reported to the Company that their investigations of the claims have not indicated sufficient promise of commercially mineable ore bodies to justify further expenditure by Great American on such investigations. Consequently, the Company has terminated the work by these engineering firms and will concentrate its efforts on the Nevada claims.

"The statement in its release with regard to machinery orders for the plant at the Copper-Silver Gold properties in Yavapai County, Arizona and that the plant is expected to be in production within 90 days does not alter the statement we previously made on April 12, 1966 that it is not now definitely established whether or not there is commercially mineable ore body at the property."

It does not appear that the Commission found fault with the statements made regarding the Nevada property.

This "clarification" was not mentioned in the moving papers and was brought to the attention of the Court on the argument.

Trading was again suspended on April 29, 1966. The order of suspension recited that it was predicated on serious questions as to the accuracy and adequacy of information relative to corporate acquisitions and mining property in which GAI holds options.

It is further stated by the Commission that during its investigation, which still continues, the Commission uncovered further false and misleading statements in the 8–K reports, in that they did not disclose that "almost one-half of the shares to be issued for the purchase of the three purported mining properties were to go to a group of finders headed by defendant Matusow."

On May 11, 1966, an 8–K Form was filed reporting the same information on the Nevada property as that which had been reported in the April 27, 1966 press release. Attached to this report was a "feasibility study of the sulphur deposit owned by the Pacific Sulphur Company" made by Canyon State Mining Corporation of Nevada. The falsity here charged is the failure to disclose the participation of the finders in the 300,000 shares of GAI and to disclose that the author of the feasibility study was "actually one of the owners and sellers of the Nevada property, and that the named owner, Pacific Sulphur Corporation, was an entity formed to take title to the property on behalf of the owners and the defendants Matusow, Pagnani and Beard and to be the vehicle through which the conveyance to GAI was to be effected."

In addition, the Commission has charged the defendants with a revision of the agreement on this Nevada transaction after the commencement of its investigation in order to conceal the fraud that was being perpetrated upon GAI and its stockholders.

It appears that on June 13, 1966, three days before the institution of this action, a further 8–K Form was filed with the Commission, which according to defend-

ants gave more detailed information concerning the Nevada acquisition. The Commission does not dispute this, and since neither side has placed this report in evidence we assume it is so.

From these alleged "repeated unlawful filings" the Commission concluded that the corporate affiliated defendants were unwilling to comply with the Federal securities law, and that together with the "finder-defendants" they had defrauded the Company and its stockholders, making injunctive remedy necessary.

We turn to the first transaction—the option to acquire certain sulphur property in California—where defendants Mack, Marren and Stolz are charged with fraud in that they did not disclose that out of the 1,600,000 shares of GAI common stock issued in payment to Porter, the owner, 600,000 of these shares were to go to Matusow, Lester and Seagraves. Apart from the question of materiality as it affected GAI stockholders and might influence market purchasers, it is plain that unless these defendants knew of the division which was to be made of the stock paid by GAI by the owner among the other three, they could not be under a duty to disclose it. Here the Commission has changed from its original position and now states in its reply brief that "there is no direct evidence that Mack or any of the other corporate-affiliated-defendants had knowledge of the large finders' fees involved in the California transactions," but states that such knowledge can be inferred.

We find on the record before us that there is no direct evidence to establish that these defendants did then know of the finders' fees to be paid by the owner, Porter.

The documents show that 1,600,000 shares was the purchase price agreed on for the property, plus $250,000 on the option. Originally, Porter had asked for 1,800,000 shares and $300,000 on the option. The testimony of Porter before the Commission was that he had said nothing about his private arrangements with Matusow and the others, and that probably

the corporate people did not know of them.

To lend support to its charge that Porter asked of Mack only one million shares for the property, the Commission quoted an extract of Porter's testimony but did not quote Porter's further testimony which gave credence to the three defendants' sworn affidavits that they knew nothing about the allocation of GAI shares. Because Mack knew Matusow as a broker, or as a finder, who had called his attention to the property and introduced him to Porter, and because Matusow, Lester and Seagraves participated in the negotiations Mack had with Porter over the sale of the property, the Commission concludes that Mack knew what their arrangement was and wilfully concealed it in order to induce the issuance of the shares by GAI for the benefit of Matusow, Lester and Seagraves. Assuming this was so—and we have found to the contrary—if GAI received value for its shares it is difficult to see where the fraud lay, since it has not been charged that the identity of those receiving the stock was any part of the consideration or affected the value of the shares. What the seller of the property intended to do or had bound himself to do with them played no part in the transaction.

But, to return to the facts, in view of the Commission's concession that there is no direct evidence that any of the defendants knew of the allocation of the shares and in the absence of any circumstantial evidence proving such knowledge, the 8–K Form of February 14, 1966 stating 1,600,000 shares as the purchase price for the California sulphur property, we find was accurate and true.

As for the press release of April 27, 1966, the Commission charges that the statement that the drilling and exploratory work was being carried on by the "mine owners" on the California property was false and misleading because, in

fact, GAI had prior to that time decided on the basis of its engineers' reports [3] to discontinue further exploratory work and not to exercise its option to purchase the property. While it might be argued that the statement was not complete in that it did not disclose the advice of GAI's experts that it discontinue further work because the results were not what the seller had represented them to be, it is found that it was true and accurate in all other respects. The record shows that Mack did have an agreement dated April 13, 1966 with representatives of the owner in which they agreed to continue drilling and exploratory work according to their system, to which GAI would contribute an additional sum of money, that the results would not be known for about 60 days and that GAI's option was extended for six weeks. The option expired at the end of this period, and the contract has not been consummated.

On these undisputed facts, it is difficult to find support for the Commission's charge that on the California transaction the defendants were guilty of misleading and false statements in the 8–K forms or in their press releases.

Factually the Arizona transaction differs from the California negotiations in that here it appears probable that the corporate-defendants knew that others besides the named seller were to receive some of the GAI shares, but it still does not appear that they knew the amounts they were to receive.

The charge is that the 8–K report filed April 13, 1966 was false and misleading in that it recited that GAI had acquired the Arizona property from Basin Mining Company in exchange for 200,000 shares whereas in fact the named seller and stockholder Beard [4] was to receive only 33,000 of these, and the balance were to go to Matusow, Lester, Seagraves and Pagnani; that attached to the report was a document which "purports to be an

3. It is undisputed that Mack had hired recognized mining and drilling engineers to inspect and drill the property and report to him as to its potentialities.

4. Beard was a driller and mining engineer who had worked in the California property and had been recommended to Mack by Porter and approved by Mack's expert, Behre, Dolbear & Co.

agreement for the sale of the Arizona property at a price of 200,000 shares", and what "purports to be an investment letter" signed by Beard as to the 200,000 shares. We here note that what "purports to be an agreement" is the contract of sale between GAI and Beard and that it does recite that 200,000 shares is the price, but because it also recites that Beard is the stockholder who owns all the shares of Basin with others, less than ten in number, who have a beneficial interest, the Commission says that the corporate-defendants knew that 167,000 shares were to be paid over to the others.

The evidence before us shows that at the closing Marren inquired as to the identity of the people described in the contract as beneficially interested and was told by Beard that they were associates of his, but that he did not disclose their names or the allocation to be made of the stock, and that Beard exhibited a certificate showing that he was the sole owner of the Basin Mining stock and that the investment letter came from him alone. The fact was that Beard, Pagnani and Matusow had a joint venture agreement providing for their sharing in mining properties owned or controlled by Beard; Matusow to contribute sales services and Pagnani his legal services to a ratio of 4/6 for Matusow and 1/6 and 1/6 each to the other two, Beard and Pagnani.

There is no evidence that the corporate-defendants knew about this private agreement, although they knew Matusow as a finder who was connected with Beard and had been rather active in the negotiation of this deal, and they knew Pagnani as Beard's attorney. They undoubtedly knew that Matusow and Pagnani were to be compensated by Beard.[5]

In any event, the corporate defendants dealt with Beard exclusively as the owner and seller; the price was 200,000 shares, and there was nothing false and misleading about the 8–K report or the press release to this effect, even if they did have

ground to believe that Beard was not to keep the whole of the purchase price.

The other charge of falsity contained in this 8–K report filed April 13, 1966, it is alleged, was that there was no basis for the representations made concerning the Arizona property. The evidence here is that attached to this 8–K report were four reports—two from Beard, the owner, who also was a mining engineer of considerable experience and good background, one from Arthur D. Little, Inc., a recognized expert in the field of mining engineering, which report supported Beard's analysis of the value of the property and stated that it was favorably impressed with Beard's sincerity and knowledge and recommended an association with him, and a report by Van Dornick, another recognized expert in the field, with excellent background. All of these reports gave basis for the statements made concerning the property by the defendants in the 8–K Form report. What more should be required before a business executive would feel safe in acting on experts' reports is not disclosed. In support of what is really a criticism by the Commission of Mack's business judgment in following the four reports of his experts its only proof here is an affidavit from the Commission's Chief Mining Engineer, who apparently does not share the optimism of the other three experts and who states that in his opinion their predictions as to the property were without basis. He may be right, but we do not now so decide, nor would we on the proof before us. Even if the Commission should be found correct, it does not mean that the corporate-defendants were guilty of false or misleading statements in adopting the views of their experts.

The fact that the corporate-defendants modified the wording of the 8–K Form on the day following at the urging of the Commission is not an admission of guilt but rather the act of prudent businessmen to avoid unnecessary conflict and perhaps litigation with a Government

---

5. Matusow and Pagnani say that the defendants knew them as the persons beneficially interested with Beard. Beard says he disclosed the amount of shares he was retaining. Defendants deny this. •

agency charged with regulating their activities.

There was nothing false in the press release of April 27, 1966 reporting the ordering of machinery and equipment in order to put the property into production. This was entirely true, for Mack had entered into such an agreement with Beard on April 5, 1966.

The facts around the Nevada transaction are that on April 18, 1966 this sulphur bearing property was called to the attention of Mack by Beard and Matusow. After an inspection by Mack and his mining expert Behre and a favorable report on it recommending exploratory drilling, Pagnani, under his joint venture agreement with Beard and Matusow, drew the sales contract between GAI, as purchaser, and Pacific Sulphur Company, as seller. This contract (not before the Court) we are told provided for the acquisition of all the stock of Pacific Sulphur in exchange for 300,000 shares of GAI plus a royalty payment of $4,500,000 to Crofoot Lumber Co. The property, it appears, was really owned by three interests—Crofoot Lumber Co., Commonwealth Silver Co. and Canyon State Mining Co.—which had formed Pacific Sulphur Company for this transaction. Under the sale agreement the GAI shares were to be apportioned: 17,340 to Crofoot and 41,330 each to Canyon and Commonwealth and the balance of 200,000 shares to Matusow and Pagnani and Beard (⅘, ⅒ and ⅒ according to their agreement). In addition, Matusow guaranteed Crofoot a value of $250,-000 on the 17,340 shares received by it. The closing scheduled for April 20, 1966 never took place because of the trading suspension and also because in the meantime a lawsuit had been started by one claiming that it had a contract of purchase with Crofoot. After further negotiations, on June 3, 1966, a new agreement was drawn providing for the same price of 300,000 shares of GAI stock but to be differently apportioned—Matusow, Beard and Pagnani to receive 15,000 shares each and the balance to go to

Crofoot to increase its allocation to 44,-232 shares and Canyon and Commonwealth to 105,384 shares each. The other changes were that GAI assumed Matusow's guarantee to Crofoot that the stock it received would be worth $250,000; the sellers were to indemnify GAI against the lawsuit brought and in addition were to assume 50% of the expense of exploration up to $100,000. It was also provided that the shares to be issued to them by GAI were to be proportionately reduced in the event that the property returned less than 5 million tons of sulphur ore. This is apparently the agreement which is on file with the Commission now. The closing of this revised agreement was fixed for July 15, 1966 and has not taken place, because of the suspension.

As indicative of the fraud the defendants were bent upon perpetrating, the Commission points to the fact that although GAI took over Matusow's guarantee to Crofoot, the shares which he was formerly to receive because of this guarantee were given not to GAI but to the sellers. Defendants reply that the change of guarantors had nothing to do with the purchase price which was fixed at 300,000 shares, irrespective of its allocation, and that in exchange for the guarantee GAI received further benefits. Viewed in the light of the proof before us whether the revised arrangements were or were not beneficial to GAI is not the concern of the Commission or of this Court. With the Commission's concession that it is not questioning the value of the properties acquired in exchange for the shares issued—we must assume in this matter that the Nevada property was worth the 300,000 shares, irrespective of how many persons were to receive them—the failure of the defendants to disclose the allocation of the shares paid was not a failure to disclose the true purchase price demanded by the sellers. Obviously, the same is true concerning the other properties.

■■ It is essential that the concealment, omission or untruth be of a mate-

rial fact.[6] This means that the fact concealed or omitted influenced or should have influenced the issuer in its decision to issue the stock in question, or would under the circumstances influence a buyer in the market. This the Commission has failed to establish. Because the "finder-defendants" were to receive a substantial and even disproportionate part of the shares issued to the owner and seller of the property for what it considered to be little or no consideration, the Commission has assumed that the concealment of their identity and the extent of their participation was the concealment of a material matter; and since this took place in connection with the issuance of stock, it has concluded that the issuer was defrauded and the statute violated.

■ In view of the fact that the Commission does not charge that the failure to disclose the participation affected the value of the property received by GAI in exchange for its stock, it must charge that had GAI known that the stock it issued to the nominal seller was not going to be retained by him but was going to be distributed among several other people it would not have issued it, irrespective of the value of the property. This it has not done, and there is not one scintilla of evidence to this effect. Consequently, assuming that defendants knew all the details of the seller's arrangements with the "finder-defendants" and did not disclose them, they would not be guilty of a fraud in connection with the issuance of the stock (List v. Fashion Park, 2 Cir., 340 F.2d 457).

■ Whether or not, as the Commission charges, these finders, Matusow, Seagraves, Lester and Pagnani, gave any consideration in exchange for their shares was, under the circumstances here present, of no concern to GAI, which dealt with the named seller alone. There is no evidence, and no charge is made, that GAI or the corporate-defendants had any contractual arrangements disclosed or undisclosed with any of these finders. On the contrary, it appears from the record before us the arrangements were strictly among the finder defendants themselves, and this included the consideration they extended for the stock they received.

We find specifically that the Commission has failed to establish on this motion that defendants knew the arrangements which existed between the seller and the finders on the California and Arizona properties. We also find that even if they had known, as they unquestionably did in the Nevada transaction, their failure, under the circumstances shown before us, to disclose them in the 8–K reports and the press releases did not constitute a violation of Section 10(b) or Rule 10b–5.

The charge that the Nevada agreement was redrawn in order to conceal the fraud on GAI falls by reason of our finding that there was no fraud and also of its own weight. If defendants were out to fraudulently induce GAI to issue its shares, as is charged, a change in the reallocation of the same number of shares would still be a rather obvious fraud. Perhaps the investigation did make defendants take a harder look at their bargain, but this would not be evidence of consciousness of guilt. Besides, the Commission has not disputed the reasons advanced by all defendants for the revision of this agreement.

■ We also find that it has failed to establish that the statements contained in the press releases and the 8–K Forms concerning these properties were knowingly false and misleading or made without basis in fact, in violation of Section 10(b) and Rule 10b–5.

While this conclusion would not foreclose a finding that the 8–K reports by reason of inaccuracy or incompleteness did not comply with the filing and reporting requirements of Section 13(a)

6. Of course, there can be no concealment, omission or untrue statement unless the fact is within the knowledge of the issuer or the statement is so recklessly made as to constitute a fraud.

and Rule 13a–11, the Commission has failed to establish any such violation. The requirement of the Rule is simply that certain events specified in the Form, such as the acquisition or disposition of assets and increases in the amount of securities outstanding be reported on a current basis, in order to furnish information necessary to enable investors to make informed investment decisions. The conclusion that this purpose was thwarted by misleading and inaccurate reports which concealed an alleged "syphoning off" of GAI stock and caused investment decisions to be made on misleading and insufficient information is not supported by the evidence presented on this motion.

■ We come then to the violation of Section 16(a) and Rule 16a–1 charged against defendant Mele. There is no question that he failed to report his purchase on January 12, 1966 of 2,000 shares of GAI securities while he was a vice president and treasurer and a director of GAI. In addition to this charge, Mele admits that he failed to file similar reports of six different transactions in 1965 and three in 1966 totaling some 10,000 shares of GAI stock. The purchase on January 12, 1966 was at a low price of $2 per share preceding the announcement of the acquisition of the option on the California property; a subsequent sale in April 1966 was at the increased price of $11 per share.

The deliberateness of Mele's conduct is attested to by the fact that although the Commission had commenced its investigation in March 1966 and had instituted its suit on June 16, 1966, it was not until June 30, 1966 that he filed the required reports and by the further fact that he lied to Mack when queried as to whether he had bought or sold any GAI stock since January 1966.

In view of the position Mele held with the corporation and his background of similar positions for the past 20 years, his attempted explanation that he did not know that he had to report transactions which he carried on in a street name is not only incredible but adds to his culpa-

bility, since it made the transactions more difficult to trace. That he was well aware of the requirements of the law is evidenced by the fact that on other occasions he had reported purchases of GAI securities. His repeated violations of the law, coupled with his belated and enforced compliance require that he be directed to comply with the filing requirements and be enjoined from further violations of Section 16(a) and Rule 16a–1, and an order so providing will be entered.

In all other respects, on the record now before us, the motion for a preliminary injunction is denied. Settle order on notice.