SECURITIES AND EXCHANGE COMMISSION, Plaintiff-Appellant,

v.

GREAT AMERICAN INDUSTRIES, INC., Walter S. Mack, Jerome Matusow, Frederick J. Pagnani, William Thomas Beard, Emanuel Lester, Odie R. Seagraves, Bernard D. Marren, Irving Stolz, Defendants-Appellees.

No. 370, Docket 31010.

United States Court of Appeals Second Circuit.

Argued March 22, 1967.

Submitted to the in banc Court May 2, 1968.

Decided Dec. 23, 1968.

Certiorari Denied May 26, 1969. See 89 S.Ct. 1770.

Philip A. Loomis, Jr., Gen. Counsel, Walter P. North, Associate Gen. Counsel, Meyer Eisenberg, Asst. Gen. Counsel, David J. Myerson, Atty., Washington, D. C., for Securities and Exchange Commission.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, Simon H. Rifkind, Richard H. Paul and Thomas R. Farrell, Jr., New York City, of counsel, for defendants-appellees Great American Industries, Inc., Walter S. Mack, Bernard D. Marren and Irving D. Stolz.

O. John Rogge, New York City, for defendant-appellee Jerome Matusow; Weisman, Allan, Spett & Sheinberg, New York City, of counsel.

Walter Feldesman, New York City, Justin W. D'Atri, New York City, of counsel, for defendant-appellee Frederick J. Pagnani.

Leinwand, Maron & Hendler, New York City, Milford D. Gerton, New York City, of counsel, for defendant-appellee William Thomas Beard.

Before LUMBARD, Chief Judge, and WATERMAN, MOORE, FRIENDLY, SMITH, KAUFMAN, HAYS and ANDERSON, Circuit Judges.

FRIENDLY, Circuit Judge:

This appeal by the SEC from an order of the District Court for the Southern District of New York, 259 F.Supp. 99, denying its motion for a temporary injunction with respect to alleged violations of § 13(a) of the Securities Exchange Act and of Rules 13a–11 and §§ 10(b), 10b–5 thereunder was initially heard by a panel consisting of Judges MOORE and HAYS of this court and Chief Judge Zavatt of the District Court for the Eastern District of New York. Since certain conclusions supporting the majority's decision to affirm ran counter to the position of the majority of the panel in SEC v. Texas Gulf Sulphur Co., 401 F.2d 833 (1968), which was under advisement at the same time, we determined that this case also should be heard *in banc* upon the briefs already submitted and the opinions prepared by the panel.

The disposition of the motion for a temporary injunction on the basis of affidavits and of testimony at "private conferences" before the SEC, although apparently acquiesced in by all parties, illustrates the defects in that practice, which we subsequently condemned in SEC v. Frank, 2 Cir., 388 F.2d 486, 490–492 (1968). The SEC's application was supported by a long affidavit of one of its lawyers and a short one from its Chief Mining Engineer; the former gave mere excerpts from various of the press releases and reports of which the SEC complained rather than the full text. Cf. SEC v. Frank, supra, 388 F.2d at 489. Defendants answered with eight affidavits; some but by no means all of the relevant documents were annexed. No witnesses were heard but the SEC furnished the court with transcripts of the testimony it had taken. In his opinion Judge Ryan complained time and again that documents were not quoted in full text or presented as exhibits. As to certain issues the degree of knowledge possessed by corporate officers was critical, yet the judge had to determine this without seeing or hearing them, cf. 388 F.2d at 491. The disorganized record has similarly handicapped us in considering this appeal. We reaffirm our ruling in SEC v. Frank, supra, and further place the Commission on notice that even when exceptional circumstances may warrant dispensing with an evidentiary hearing on a motion for a temporary injunction or the defendants may agree to that course, the district courts are not to accept the kind of moving affidavit that was offered here; the Commission has sufficient facilities to enable it to present documents in full text.

The action concerned a number of press releases, reports, and failure to report and disclose during the winter and spring of 1966, relating to three mining ventures of a company somewhat extravagantly called Great American Industries, Inc. (GAI)—a sulphur property in California, a copper mine in Arizona, and a sulphur mine in Nevada. Mining was a new activity for GAI which had previously been engaged through subsidiaries in the manufacture and sale of a variety of less glamorous products such as cookies, crackers, rubber goods and soft drinks. From January 1, 1965 to January 1, 1966, the price at which GAI common stock traded on the American Stock Exchange never exceeded $2 per share; the average number of shares traded daily during 1965 was 8,500. In contrast, from January 13, 1966, when GAI announced its first venture into mining until the Commission suspended trading on April 29, 1966, an average of 185,000 shares was traded daily. During this period the price of the stock went as high as 14⅝; on April 27 the closing price was 10⅛.

The Commission's complaint alleges three categories of violations. The first is that in press releases and in 8–K reports to the SEC and the American Stock Exchange, GAI made untrue statements of material facts or omitted to state material facts "necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading," in violation of Rule 10b–5 as to the press releases and § 13(a) and Rule 13a–11 as to the reports. See also § 18(a). The second is that the corporation and its officers violated the same provisions by failing to disclose in press releases and 8–K reports that a substantial portion of the consideration for the three properties was known by them to be payable not to the owners but to intermediaries. The third is the opposite side of the latter coin; the SEC contends that in instances when the sellers failed to disclose the large participation of the finders to GAI, they violated Rule 10b–5. Before proceeding further we note that such of defendants' arguments as are based on a narrow construction of the phrase of § 10(b) of the Securities Exchange Act and Rule 10b–5, "in connection with the purchase or sale of any security," have been rejected by our decision in SEC v. Texas Gulf Sulphur Co., supra, 401 F.2d at 847.

## I.

The first press release of which the SEC complains was issued by Walter S. Mack, chairman of GAI, on March 21, 1966. Although a final paragraph dealt also with the California sulphur property, the SEC's criticism relates to a preceding one concerning the Arizona property which we reproduce in the margin.[1] Mack had acquired the option to the Arizona mine on the advice of Arthur D. Little, Inc., a reputed engineering firm, and later of another engineer, Dr. Edward Van Dornick. The Little report, dated March 18, 1966, had characterized the property as "a potentially promising ore deposit" which should be explored "to accurately determine its potential value." The report estimated the cost of such an evaluation at $72,000 plus the $50,000 down payment required to obtain an option.

While injunctive relief would hardly be warranted if this issue stood alone, the release, perhaps unintentionally, created an exaggerated impression. We refer particularly to the sentence, "Mr. Mack stated that he is advised that the mine can be in production within 90 to 120 days and will ship its concentrated ore to one of the large existing smelters in Arizona, at not too great a distance." Although literally true, this scarcely conveyed what was the fact, namely that GAI then had no intention of putting the mine in production unless the additional investigations during the 60-day period

of the option showed that this would be warranted. The difference between what was said and what should have been is illustrated by a clarifying press release dated April 12, stimulated by the SEC's suspension of American Stock Exchange and over-the-counter trading in GAI stock on March 31. This attributed the SEC's action to reports and rumors emanating from others and made clear, "It is not now known whether or not there is a commercially mineable ore body at the property." The release went on to say that GAI had exercised its option, which had 45 days still to run.[2]

Despite the April 12 release GAI filed with the SEC on April 13 an 8-K report prepared by defendant Marren with the aid of defendant Stolz. After reciting the acquisition of all the stock of Basin Mining Company, the owner of the Arizona property, the report continued:

> Investigation by Great American Industries, Inc., indicates that this mine can be operated within a period of 90 days on a basis which will produce an operating profit of approximately $50,000 a month. It is also anticipated that substantial ore reserves will be available for development on a larger basis which would involve the installation of equipment and an investment of more capital funds as a result of which the net profit may be increased to $3,000,000 a year.

Complaint by the Commission's staff resulted in a letter from the company's

---

1. "Walter S. Mack, Chairman of Great American Industries, Inc. just announced today that they had completed arrangements to acquire an option for 60 days on a new mining strike of Copper, Silver, and Gold ore in the Tiger Mining District, Yavapai County, Arizona, consisting of 24 claims on about 480 acres. During this 60-day period, Great American Industries will have additional investigations made to help further appraise this property and its reserves.

   "Mr. Mack stated that this new discovery is close to the area called 'Silver Mountain' in Arizona, which has had a history of good production of Silver and Gold. It is an open face pit lode mine, which will make it easier and economical

   to get into production. Mr. Mack stated that he is advised that the mine can be in production within 90 to 120 days and will ship its concentrated ore to one of the large existing smelters in Arizona, at not too great a distance. This mine has the added advantage of having both water and power close by. Mr. Mack stated that at this time, he was unable to estimate the earning potential of this property."

2. The release also said it was now "intended to construct and operate * * * a mill within four to five months, despite the fact that it is not now known whether or not there is a commercially mineable ore body at the property."

counsel on April 14 acknowledging that the statements concerning the Arizona property were inconsistent with the press release, claiming they were included "through inadvertence," and enclosing a substitute page which replaced the quoted passage by the following:

> Investigation by Great American Industries, Inc. indicates that this mine can be operated within a period of 90 days. It is not now known whether or not there is a commercially mineable ore body at the property. The Company has no reports establishing the existence of such an ore body. Only limited exploratory work has been done thus far, and further exploration is intended.

■ The difference between the two versions is too great for rescue on the basis, advanced by the district judge, of being "not an admission of guilt but rather the act of prudent business men to avoid unnecessary conflict and perhaps litigation with a Government agency." 259 F.Supp. at 107–108. Experienced counsel for GAI took no such view; conceding that the statement in the initial filing was wrong, they sought to excuse it as inadvertent. In view of the prompt correction no harm seems to have been done—indeed GAI contends the report had not been placed in the public file either of the Commission or the ASE until the substitute page was filed. The Commission, however, cannot be expected to have the time, the resources or the material to enable it to police 8–K reports as quickly and thoroughly as it did here. The statute places the duty of filing correct reports on the issuer; while inadvertence and prompt correction after complaint are mitigating circumstances and may affect liability for damages, they do not defeat the SEC's right to injunctive relief. See SEC v. Texas Gulf

Sulphur Co., supra, 401 F.2d 833, 864 (concurring opinion of Friendly, J.).

On April 15 the SEC lifted the suspension on trading. Twelve days later Mack issued another press release announcing the proposed acquisition of the Nevada claims, the third of the properties, and commenting on the other two. As to the Arizona property he stated that the "machinery and equipment was now being ordered which should put this property into production in about 90 days." As to the California property the release said that "additional drilling and exploratory work is now being carried on by the mine owners on the 340 acres of sulphur bearing deposits in California under option to Great American but results on this work will not be available for 60 days." Again the SEC complained and rectification was made by an amplifying press release the next day, April 28. As to the Arizona properties this was simply a reaffirmation of the statement in the April 12 release and the corrected 8–K report "that it is not now definitely known whether or not there is a commercially mineable ore body at the property." The deficiency as to the California property was much more serious. The April 28 release disclosed that the two engineering firms retained by GAI as to this property, Arthur D. Little, Inc. and Behre, Dolbear and Co., had reported "that their investigation of the claims have not indicated sufficient promise of commercially mineable ore bodies to justify further expenditure by Great American on such investigations. Consequently, the Company has terminated the work by these engineering firms and will concentrate its efforts on the Nevada claims." In other words, the California venture had disappeared for the time being and would be revived only if further work by the sellers should induce GAI to take a new interest.[3]

---

3. Behre, Dolbear & Co. had been engaged by Mack for the specific purpose of determining the quantity of sulphur bearing ore in the California property. On April 12, 1966, Dr. Behre met with Mack and informed him that the ore "was petering out below the surface" and expressed serious doubts as to the commercial value of the California property. On the following day, Mack met with the sellers and conveyed Behre's opinion. They criticized the core recovery techniques, asserting that pulverized sulphur was being blown away with a resulting diminution in as-

The final item under this heading is that GAI's 8–K report for April, 1966, included a "feasibility study" of the Nevada properties. This had been prepared by Canyon State Mining Corp., one of the sellers, but the report did not disclose this. Obviously this was an omission of a material fact; GAI in effect recognized this by including a reference to it in a subsequent 8–K report.

■ The evidence we have summarized compelled a finding that the deficiencies in the press releases and reports were not merely negligent, as alleged with respect to the April 12 press release in SEC v. Texas Gulf Sulphur Co., supra, but something more. The Commission was entitled to an injunction against their repetition.

## II.

■ In this section of the opinion we state the facts as to the division of the consideration paid by GAI for the three properties, GAI's knowledge thereof, and the releases and reports with respect thereto:

### (1) *The California property.*

In November 1965 defendant Matusow, whom Mack had known for a year and a half and believed to be a real estate broker, called Mack's attention to this property, owned by Consolidated Sulphur Corporation. Later Matusow introduced Mack to Kenneth Porter, president of Consolidated. They worked out a letter agreement wherein Consolidated granted GAI a 90 day option, pending reports by the two engineering firms GAI had retained. If GAI decided to make the purchase, it was to pay "to the owners of the property" 1,600,000 shares of its stock and $250,000 in cash. Porter testified before the SEC that he had agreed with Matusow that a "group" consisting of Matusow, defendant Lester and one Frank Howard were to receive 600,000 of these shares for their "services," although it does not appear that Mack ever saw Howard. The moving affidavit of the SEC attorney alleged that defendant Seagraves was to receive half of Lester's share; Lester denied this and Seagraves' affidavit says he was never to get anything except as a stockholder in Consolidated Sulphur.

GAI's 8–K report filed on February 15, 1966, recited the arrangement to issue 1,600,000 shares and said nothing about the destination of the 600,000. Judge Ryan found there was no direct evidence that GAI or any of its officers knew of the latter and evidently refused to infer such knowledge; this surely was not clearly erroneous.

### (2) *The Arizona property.*

Mack first heard of this property from defendant Beard who owned it, apparently through ownership of all the shares of Basin Mining Company. Matusow soon appeared on the scene. The option agreement of March 21, 1966, providing for a purchase price of $50,000 plus 200,000 shares of GAI stock, was with Beard. The later agreement of April 5, 1966, was with Beard as the "Stockholder" of Basin; he represented himself as owning all its stock and warranted that he would take and hold the GAI shares for investment and not with a view to sale or distribution. In fact, as acknowledged in Beard's affidavit, he had agreed early

say values. The parties agreed to alter the recovery technique.

Behre confirmed his pessimism in a letter dated April 14 but agreed to continue as agreed with the sellers. Behre subsequently reported by mail on April 20 that he had confirmed the validity of the core recovery techniques and reaffirmed his conclusion that the property contained no appreciable sulphur deposits. Mack met with Behre and his associates on April 26 and Mack informed the sellers the next day of the unsatisfactory results of Behre's testing. The latter repeated their criticism of the technique and declared that they would continue exploration at their own expense since Mack had indicated that GAI would expend no further sums on the property. Mack also stated that if and when the property had been proved worthwhile, a new contract of sale would be negotiated. Mack immediately informed the GAI board of this action and the April 27 press release followed thereafter.

in the winter that if Matusow could obtain $50,000 to enable him to pay off a bank debt, he would give Matusow five-sixths of any stock received in addition. Matusow later informed Beard that he had retained defendant Pagnani to handle the legal work and that Pagnani was to receive one-sixth of any stock—this to come out of Matusow's share. The press release of April 12 and the 8-K reports of that month referred to the issuance of 200,000 GAI shares without mentioning that only one-sixth would go to Beard. The District Court found, however, 259 F.Supp. 107:

> "There is no evidence that the corporate-defendants knew about this private agreement, although they knew Matusow as a finder who was connected with Beard and had been rather active in the negotiation of this deal, and they knew Pagnani as Beard's attorney. They undoubtedly knew that Matusow and Pagnani were to be compensated by Beard."

We must accept these findings.

### (3) The Nevada property.

This property was called to Mack's attention in April 1966 by Beard and Matusow. It was owned by Pacific Sulphur Company, a consortium representing three interests, Crofoot Lumber Co., Commonwealth Silver Co., and Canyon State Mining Co. The contract dated April 22, which the SEC has not produced, evidently provided for the issuance of 300,000 GAI shares, then selling in the $11–$14 range. These were to be distributed 17,340 to Crofoot,[4] and 41,300 each to Canyon and Commonwealth, and 200,000 to Matusow, Pagnani and Beard, with the former to retain 2/3 or 134,000 shares and the latter 33,000 each. Matusow guaranteed Crofoot that its shares

would be worth $250,000. Press releases of April 27 and 28, 1966, and an 8-K report filed on May 11 said only that GAI had purchased the Nevada claims for 300,000 shares of its common stock "which are to be taken by the sellers for investment and not for public distribution."[5] In this instance GAI and its officers did have knowledge of the peculiar division of the consideration.

The contract could not be closed as scheduled because of the suspension of trading in GAI on April 29 and a suit brought by a person claiming to have had a purchase contract with Crofoot. Later it was renegotiated so that Matusow, Beard and Pagnani would each receive 15,000 shares, Crofoot's portion was raised to 44,232 shares and Canyon's and Commonwealth's to 105,384 each, GAI assumed Matusow's guarantee to Crofoot, and other changes favorable to GAI were made.

### III.

On this appeal the Commission's contention that failure by GAI and its officers to disclose the large portions of the consideration going to persons who were not owners must thus be limited to the Nevada property, as to which alone they were found to have had knowledge.[6] As to this, the April 27 and 28 press releases and the 8-K report for that month at least omitted to state a material fact which the company had a duty to disclose; indeed the reference to the issuance of the 300,000 shares to "the sellers," with only Pacific Sulphur so identified, could well be said to be an "untrue statement of a material fact."

This court has defined a material fact as a fact to which "a reasonable man would attach importance * * * in determining his choice of action in the

---

4. Apparently Crofoot was also to receive certain royalty payments.

5. We are told that the 8-K report, not proferred by the SEC as an exhibit, "merely listed the seller of the property as Pacific Sulphur Corporation."

6. In addition to the passages previously quoted, Judge Ryan stated, 259 F.Supp. at 109:
   > We find specifically that the Commission has failed to establish on this motion that defendants knew the arrangements which existed between the seller and the finders on the California and Arizona properties.

transaction in question." SEC v. R. A. Holman & Co., 366 F.2d 456, 459 (2 Cir. 1966), quoting List v. Fashion Park, Inc., 340 F.2d 457, 462 (2 Cir.), cert. denied sub nom. List v. Lerner, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965). We have further developed our views on materiality in SEC v. Texas Gulf Sulphur Co., supra, 401 F.2d at 849. That reasonable traders in stock of a company buying mining property would be influenced by knowledge that the vendors were willing to pay two-thirds of the price to persons who could produce a buyer would not appear to require extended argument. A person learning that GAI had issued 300,000 shares of its stock, worth some $3,600,000 at then market prices, for the Nevada properties, might well have a different idea of the properties' value if he knew the owners were in fact receiving only $1,200,000, with the difference going to intermediaries who had effected the sale. Such knowledge would not cease to have been material even if the mine later turned out to have been a bargain. This is not to say that any variation of a finder's fee from conventional norms would be so material as to require disclosure; willingness to pay intermediaries two-thirds of the price (the fraction being here subject to some slight reduction for Matusow's guarantee of the value of the Crofoot stock) is so unusual as to raise legitimate question in the mind of a prospective purchaser of GAI stock whether GAI had not been "taken" and whether the Nevada mine was worth anything like what GAI was paying for it. Even if we were to assume that GAI and its officers did not realize the materiality of the distribution of the 300,000 shares, our holding in SEC v. Texas Gulf Sulphur Co., supra, with respect to TGS's April 12 press release in that case settles that Rule 10b–5 (2) authorizes the granting of injunctive relief. While the trial judge might still have been within the bounds of allowable discretion in holding that no sufficient case for issuing an injunction had been made if this episode stood alone, see concurring opinion of Friendly, J., in SEC v. Texas Gulf Sulphur, supra, 401 F.2d 833, the failure to disclose the known destination of 200,000 of the 300,000 shares must be considered along with the misleading releases and reports considered in section I of this opinion. As in SEC v. Texas Gulf Sulphur Co., supra, our decision is limited to injunctive relief; we intimate nothing as to liability for damages.

### IV.

The SEC seems to regard the case against the defendants who failed to disclose to GAI the large payments to be made to "finders" as identical with that against GAI and its officers for failure to reveal what the company knew. The argument runs as follows: First, the large proportion of the consideration to go to the finders was "a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."—a position with which we have expressed sympathy in section III. Second, Rule 10b–5 condemns an omission to state such a fact by "any person," by the use of certain specified means of communication presumably present here, "in connection with the purchase or sale of any security." Finally, the omission was "in connection with" these defendants' proposed purchases of stock from GAI.

It must be conceded that imposing on sellers of property or finders a duty of full disclosure to a buyer issuing securities in exchange, with a consequent duty on the part of the latter to publicize material facts so disclosed, would increase the protection afforded investors and traders by the securities laws. On the other hand, to read Rule 10b–5 as placing an affirmative duty of disclosure on persons who in contrast to "insiders" or broker-dealers did not occupy a special relationship to a seller or buyer of securities, would be occupying new ground and would require most careful consideration. Without attempting to predict the result of such consideration, distinctions might be drawn, for example, according to the importance of the transaction, be-

tween sellers of property and finders, or between finders acting solely for such sellers and those having a special relationship with the issuer. We are loath to undertake this task where, as noted at the outset, the record is so unsatisfactory. We find there is no need for doing so.

With respect to the Arizona property there was evidence concerning defendants Beard, Matusow and Pagnani that went considerably beyond non-disclosure. The purchase agreement recited that the stock of Basin Mining Company was owned by Beard "and others, less than ten (10) in number, who have beneficial interests therein." Marren, vice president of GAI, stated in discussing the closing of the Arizona transaction, "When I asked specifically who were the other individuals with a benefit interest in Basin Mining Company, Mr. Beard [the seller] said that they were local associates of his. I noted that paragraph 11 of the purchase contract stated that 'the parties agree that no broker or finder has brought about the transaction contemplated by this agreement.'" Matusow and Pagnani were present when these statements were made. Beard's affidavit did not deny the statement attributed to him. Matusow's asserted he told Marren "that the others were Pagnani and me"; Pagnani's claimed that his function was solely to render legal services and, inferentially, that GAI knew this. Even if we accept Matusow's version, it was so far from the full truth, namely, that Matusow and Pagnani were to receive five-sixths of the consideration —four-sixths of this going to Matusow for "finding"—as to run foul of the principle that "One party to a business transaction is under a duty to disclose to the other before the transaction is consummated * * * such additional matters known to him as he knows to be necessary to prevent his partial statement of the facts from being misleading. * * *" Restatement of Torts 24.551(2) (b) (Tent. Draft No. 12, April 27, 1966). Whatever the situation might otherwise have been, Marren's question required those present at the closing to speak up and clarify what was meant in the purchase agreement by "finders" and "local associates," and to explain their financial relationship. This duty was not discharged. Since the conduct of Beard, Matusow and Pagnani constituted common law fraud "in connection with" the purchase of securities, Rule 10b–5 is plainly applicable, see SEC v. Capital Gains Research Bureau, 375 U.S. 180, 195, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963); 3 Loss, Securities Regulation 1435 (1961 ed.), and the SEC was entitled to an injunction against them irrespective of Matusow's later involvement in the California property.

This leaves only the propriety of the denial of a temporary injunction with respect to Lester and Seagraves, who were concerned with the California mine alone. Here the record is quite confusing. While Lester admitted that he knew 37½% of the GAI shares were to be allotted to Matusow and that he and Howard were each to receive one-third of the allotment, he claimed that his share was to be paid for relinquishing an oral agreement to buy the property. As noted above, Lester denied that Seagraves was to have any part of his share and Seagraves asserted that he was never to get anything save as a stockholder of Consolidated Sulphur.

On this state of the record the judge was surely justified in denying a temporary injunction with respect to Seagraves. And, even on the SEC's view of the law, it is arguable that Lester reasonably supposed Matusow had revealed the facts to GAI. It would be most unwise for us to move into new legal ground from such a soggy factual base. Rather we shall vacate the denial of a temporary injunction against Lester and Seagraves and remand the issue to the district court which, if the SEC should choose to pursue this dispute, relating to events of two and a half years ago, can consolidate the application for a temporary injunction against these two defendants with a final hearing. See F.R.Civ.P. 65(a) (2).

We therefore reverse so much of the judgment as declined to issue a temporary injunction against defendants GAI, Mack, Marren, Stolz, Beard, Matusow and Pagnani and direct the issuance of an appropriate injunction. We vacate so much of the judgment as declined to issue a temporary injunction against defendants Lester and Seagraves and remand for further proceedings consistent with this opinion.

WATERMAN, Circuit Judge (concurring):

I concur in Judge FRIENDLY'S opinion. The area of the law into which the Securities and Exchange Commission has now moved is an area in which perceptive regulatory proceedings have been long overdue when it is recognized that the intent of Congress was to protect individual outside investors who buy and sell corporate securities on national exchanges from receiving incomplete or inaccurate information from corporate officers and corporate management. In adjudicating the Commission's regulatory efforts in the area, we must, of course, move on a case-by-case basis, and with care, as in SEC v. Texas Gulf Sulphur, 401 F.2d 833 (2 Cir. Aug. 13, 1968) but with the Congressional mandate to protect investors always in mind. As stated in the concurring opinions of my brothers KAUFMAN and HAYS, there is a world of difference on the one hand between cash buy-sell agreements and agreements to compensate finders in cash and, on the other, those agreements when management arranges to have blocks of stock be the consideration. For now, in view of the somewhat casual and confused record before us here, I am content with Judge FRIENDLY'S conservative disposition of the issues presented to us in the present case.

IRVING R. KAUFMAN, Circuit Judge (concurring):

My dissenting brother, Judge MOORE, leaves the impression that the majority is dealing with startling new principles, ignoring that what we say today follows in the wake of SEC v. Texas Gulf Sulphur Corp., 401 F.2d 833 (2d Cir. decided Aug. 13, 1968). I therefore have no difficulty in concurring in the majority opinion. And since the record is quite obfuscated as to the defendants Lester and Seagraves, I agree that we are compelled to remand their cases for further hearings.

Inasmuch as these cases are of great importance to the financial and business community, I believe it appropriate to add this caveat: Those who buy or sell securities may no longer assume that the unmended fences of common law fraud will remain the outer limits of liability under Rule 10b–5. Prof. Bromberg has succinctly stated that the rule's proscription is considered to be "closer to unfairness than what either lawyers or laymen usually think of as fraud." A. Bromberg, Securities Law: Fraud: SEC Rule 10b–5, ¶ 1.1 at 5 (1968).

Thus, in the Arizona affair—and perhaps in the California transaction as well—the finder defendants received exorbitant fees for the performance of minimal services. They were awarded such a disproportionate percentage of the total consideration paid for the property that, were this arrangement disclosed, it would clearly have indicated the property could not be worth the price paid. This is not, as Judge MOORE hypothesizes, similar to a marital transfer where there could be other plausible explanations for the proposed allocation. Matusow and Pagnani performed the services that finders usually perform and, on the abbreviated record before us, it is idle speculation to attribute their actions to an alleged joint venture especially in the light of their deliberate misrepresentations to G. A. I. of how the proceeds would be allocated. Here, had G. A. I. known of the proposed allocation of the proceeds, it might well have refused to proceed with the negotiations. Accordingly, in not revealing the percentage of the purchase price that was destined for the finders, the defendants failed to disclose a material fact.

While it is true that in the usual business transaction a seller need not dis-

close how he intends to dispose of the money paid him, this was not an ordinary transaction. The excessive harvest being reaped by those who had sown but little was so extraordinary that I question the propriety of the failure of the finder defendants to disclose it.

My basic text is that the property was not sold for cash but for securities. The limits of "fraud" under the securities law are not identical with those of common law deceit—an appropriate standard were this a cash transaction.

In a cash transaction, only the buyer and the seller are affected by a "fraud." If the buyer does not get the best price, only he, and no one else, is harmed. Where the buyer pays with securities, however, it is not too difficult to discern that many others will perforce be affected because the issuance of the new securities is likely to influence the market for the outstanding stock of the company. (Throughout the relevant period, it should be noted, G. A. I.'s stock was traded very actively—on the occasions when the SEC permitted it to be traded.) Thus, the injury is not exclusively to those who are parties to or participate in the negotiations, but to passive shareholders, potential purchasers, and an ever-increasing circle of others. It seems clear to me that this potential for spreading damage caused by the failure of the finders to disclose a material fact would warrant injunctive relief. I hasten to add, however, that it should not be inferred from what I have said that I am expressing any view on the propriety of a private action for damages.

I am reluctant to see the limitations of the tort of deceit stenciled onto the securities laws lest the resulting maze lead us into the common law morass of overfine distinctions which would frustrate the securities statutes. As an illustration, the common law would distinguish between partial disclosure and nondisclosure. Common law cases have held, for example, that the owner of a dwelling, although he knows full well that his home is riddled with termites, can unload it with impunity upon a buyer (without disclosure), and go on his happy way. E. g. Swinton v. Whitinsville Sav. Bank, 311 Mass. 677, 42 N.E.2d 808, 141 A.L.R. 965 (1942). See Prosser, Torts, 711 (3d ed. 1964) (calling such cases "singularly unappetizing"). The Securities and Exchange Commission, seeking to enjoin manipulation of such "intricate merchandise" as securities, H.R.Rep. No. 85, 73rd Cong., 1st Sess. (1933) 8, should not be fettered by such a wholehearted embrace of the doctrine of caveat emptor.

In sum, any claim that material facts were withheld in a transaction in connection with the sale or purchase of securities must be scrutinized with care, whether or not there would have been liability at common law for such a deed.

HAYS, Circuit Judge (concurring in the result):

Since the injunction to be issued against the defendants will presumably be cast in general terms, restraining further violations of the Securities Exchange Act, I concur in the result. However I would formulate a somewhat broader basis for liability than that upon which the majority opinion relies.

The corporate officers who participated in the purchases of the mining properties were aware, or should have been aware, that finders' fees were to be paid. They were under an obligation to inquire of the sellers of the property as to what part of the stock issued to them would be paid out as finders' fees and to report this information to the GAI board of directors and include it in press releases and reports. A rule that makes it the duty of corporate officials to report such material information only if they happen fortuitously to receive it does not go far enough in the protection of the corporation against fraudulent practices.

The finders who were to share in the excessive finders' fees were also under a duty to inform the purchasers of the property of the amount of the fees. They knew or ought to have known that fees in the amount fixed would be a material fact to be considered by GAI in determining the price to be paid for

the properties. Not only should they have been aware that knowledge of the amount of the fees would be material to traders in the stock of the corporation, but they themselves profited by any inflated value which the stock may have had by reason of their failure to disclose this material information.

Transactions in securities differ from ordinary buyer-seller deals. Other owners or potential owners of the same securities are directly affected by each transaction and the effects spread to other securities.

Moreover, although the role of the finders in the sales to GAI probably cannot correctly be classified as fiduciary in the traditional sense, neither were the finders engaging in what may be strictly characterized as an arm's length transaction. They were something more than mere agents of the sellers since their function was to bring the parties together. They owed some duty to the buyers at least to warn them of the unusual nature of the transactions in which they were engaging.

I leave to a more appropriate occasion consideration of the duty of the sellers themselves in a situation involving the issuance of securities in return for property.

MOORE, Circuit Judge (dissenting):

Were the majority opinion to come before the SEC for review, the SEC could justifiably find that its factual statements and, particularly, its omissions of material facts bring it well within the proscriptions of SEC rules and regulations. Rules 10b–5; 13a–11; §§ 10(b), 13(a); 16(a). Therefore, since so little of the case presented to the district court (Judge Ryan), and which formed the basis for his decision, has been selected by the majority in support of the conclusions it chooses to reach, a much fuller disclosure of the facts actually before Judge Ryan must be made. Such a review is only fair to Judge Ryan in appraising his decision, particularly since the majority disagree

with his resolution of the facts. The record was submitted to this court in a joint appendix approved by the parties and so directed by this court (January 23, 1967). It contains all the letters, documents, agreements, press releases and undisputed facts necessary for the immediate decision, namely, whether there was sufficient proof of reasonable likelihood of success and clear and present danger as to call for the drastic remedy of a preliminary injunction.

The case came before Judge Ryan solely upon the SEC's motion for a preliminary injunction to enjoin alleged violations of Sections 10(b), 13(a), 16(a) and Rules thereunder. Thus, the facts submitted, the matters developed on the oral arguments and the law pertaining to preliminary injunctions formed the basis for his decision. This is apparent from the order in which he denied the motion after having "considered the pleadings, motion for preliminary injunction, transcripts, exhibits, memoranda and affidavits filed in support of said motions and in opposition thereto."

### THE "COMPLAINT FOR INJUNCTION"

The complaint describes the defendants Walter S. Mack (Mack) as Chairman of the Board of Directors and a "controlling person" of Great American Industries, Inc. (GAI) and as having a beneficial ownership of 316,366 shares out of 5,200,000 shares outstanding of GAI stock. The defendants Marren, Stolz and Mele are alleged to be directors of GAI; Marren, Financial Vice-President and a member of GAI's Executive Committee; and Stolz, General Counsel for GAI and an Executive Committee member. The other defendants, Matusow, Pagnani, Beard, Lester and Seagraves are not alleged to be officers or employees of GAI.

The gravamen of "COUNT ONE" is that "Mack, Marren and Stolz as part of a scheme to defraud GAI and its shareholders (1) caused GAI to sell and divert substantial amounts of GAI's authorized but unissued common stock to certain of

the defendants for little or nominal consideration, and (2) caused the preparation, public filing and dissemination of false and misleading information concerning" the consideration paid or to be paid for certain mining properties, the parties to these acquisitions, and the status and potential of such properties, thereby concealing the purpose and effect of such transactions from GAI and from the stockholders. The complaint alleges that as a result GAI stock listed on the American Stock Exchange has "since January 1966 increased from a low of 2⅜ to a high of 14⅝ per share."

COUNTS TWO, THREE and FOUR deal with allegedly false 8-K reports (Sec. 13(a) of the Securities Exchange Act of 1934 (the Act) and Rule 13a–11 thereunder) and COUNTS FIVE and SIX relate to alleged failures to file changes in beneficial ownership statements by Mele and Stolz (Sec. 16(a) of the Act and Rule 16a–1 thereunder). No appeal is taken as to COUNTS FIVE and SIX.

### The Relief Sought

The complaint in substance demands a preliminary and permanent injunction against any violations of the Act.

### THE MOTION FOR A PRELIMINARY INJUNCTION

Supporting the motion for a preliminary injunction were an affidavit of a Commission investigator which elaborated on the allegations of the complaint, an affidavit of the Commission's Chief Mining Engineer, and depositions before the Commission of Beard, Mack, Lester and Marren. In opposition were an affidavit of Mack, stating the business purpose of GAI in seeking the acquisitions, to which were attached twenty-five exhibits (A–Y). These exhibits included financial statements of GAI, letters and letter agreements relating to the acquisitions, press releases, 8-K reports, letters of Behre Dolbear & Company, and Arthur D. Little, Inc., expert mining consultants, which will be referred in greater detail in discussing the properties to which they relate.

### The History of GAI

The immediate background of GAI may be traced from National Power & Light (1951), which became National Phoenix Industries. In 1957 National Phoenix acquired GAI and, as a result of a merger, GAI became the surviving corporation.

Mack became its president in 1958 and served in such capacity to date except during 1964–66. He had had a successful and distinguished business career, and is a well-known figure in the corporate and financial field. Since 1934 he had been the chief executive or financial officer of corporations in diverse activities, such as Phoenix Securities (financial), National Brass & Copper, Autocar, South Coast, Celotex and Certain-teed Products (building materials), Allied Stores (department stores), Pepsi-Cola (soft drinks), and Nedicks, Inc. (luncheonettes).

### The Entry of GAI into the Mining Field

As the result of substantial losses sustained by a GAI subsidiary in years prior to 1966, GAI found itself with a tax loss carry-forward of some $6,000,000 which could be used as an offset against future profits. In looking for possible business acquisitions, Mack was primarily interested in enterprises which did not involve substantial labor costs and which had claims to natural resources and "would grow with the development of the United States and the world generally" (Aff. Mack). The fact that GAI had venture capital to invest brought many properties to Mack's attention amongst which were the three mining properties here in issue. These acquisitions or contemplated acquisitions are set forth as the transactions, in which the complained-of practices occurred, more specifically referred to as the Consolidated or California, Arizona and Nevada properties.

### The Consolidated (California) Property

In November 1965 Mack learned of a California sulphur property owned by

Consolidated Sulphur Corporation. In December 1965 an option to purchase the property for (1) $300,000 in cash, (2) 1,800,000 shares of GAI stock, and (3) a royalty of $3.50 per ton was discussed by Mack with Porter, Consolidated's president, but the terms were unacceptable to Mack. After making inquiries from prominent persons in industrial and banking fields as to the best mining experts, Mack engaged both Arthur D. Little, Inc., and Behre, Dolbear & Company to explore the property. Subject to receipt of their reports and approval by the GAI Board, a tentative agreement (January 11, 1966) was entered into between Consolidated and GAI, under which GAI received an option to purchase the property for 1,600,000 shares of GAI stock, acquired for investment and not for distribution, and $250,000 in cash. A detailed report of the proposed transaction was made to the GAI Board with the recommendation of approval of investigation expenses with future action to await the engineering reports. The public was advised by press release dated January 13, 1966, of the Board's approval of the acquisition "subject to verification of previous engineering reports and evaluation of said sulphur property." The employment of the mining experts was disclosed as was GAI's right not to consummate the purchase if the evaluation was not satisfactory.

This information was also set forth in some detail in GAI's January 1966 8-K report to the Commission.

The press release of January 13, 1966 was accurate in every detail. Equally accurate and even more detailed was the information contained in GAI's 8-K Report for January 1966 (Item 2a), to which were appended all documents relating to the transaction, i.e., letter agreements, January 13, 1966, between GAI and Consolidated, letters of January 13, 1966, relating to approval by GAI directors, and letters of January 17, 1966 confirming employment of the mining experts, Arthur D. Little, Inc., and Behre Dolbear & Company, Inc.

The majority opinion omits to state these material facts and, insofar as it infers that the announcement of January 13, 1966 was to inflate the market price of GAI stock improperly (the opinion notes the increase in volume and in price from January 13, 1966 to April 29, 1966 of 2 low to $14\frac{5}{8}$ high), it is "misleading"—"misleading" because the first press release of which the SEC complains was not issued until March 21, 1966.

A much fairer statement, requiring no inferences, would have been to point out that between January 13, 1966, and March 19, 1966, the price of GAI stock had risen gradually to $7\frac{7}{8}$, without any possible stimulus from the March 21, 1966, publication.

Amongst other material facts omitted by the majority is the action (or, better, non-action) of the defendants, officers and directors of GAI, with respect to the stock during the rise. Mack, the chief executive officer, had very large stockholdings (the complaint alleges over 316,000 shares). During the rise from $1\frac{3}{4}$ to a high of $14\frac{5}{8}$, he neither bought nor sold any stock. The defendant Stolz held in his own name and through an interest in a partnership over 15,000 shares; the defendant Marren 25,000 shares. No purchases or sales were made by either defendant during the period here in issue except a sale of some 4,250 shares by Stolz' daughter and son-in-law, which stock they had received as a gift at an earlier date. Thus, it cannot be said that any defendant derived any personal advantage from the market rise. No motive, or even suspicion of a motive for personal gain, can be found in the proof.

Continuing on as to the Consolidated property, because of the necessity for further evaluation, the option was extended for five to six weeks from April 13, 1966, GAI to add $10,000 to the drilling program.

The March 21, 1966 release advised that "the sulphur-bearing property that the company was having investigated by

Behre Dolbear and Company of New York City and Arthur D Little, Inc., of Cambridge, Massachusetts, in California, was still being drilled and cored at the present time and that they would not be able to properly appraise this development until the final reports were submitted by these two companies which should disclose not only an estimate of the sulphur ore available, but indicate some estimate of the sulphur ore reserves, as well as include a recommendation of the proper method to be used for refining—and a feasibility report indicating estimates of costs and profit margins per ton of ore. It is expected and hoped that these reports will be finished and available within the next 30 days, at which time a final announcement will be made by the company concerning its plans in regard to this sulphur property."

The release of April 12, 1966, stated as to the Consolidated property: "It is not now known whether or not there is a commercially mineable ore body on these claims. The sulphur claims are now being investigated for the Company by engineering firms of the highest reputation—Behre Dolbear & Company of New York City and Arthur D. Little, Inc. of Cambridge, Massachusetts. The Company, which has not as yet received any reports regarding the value and potential of these claims, is awaiting the results of their investigation. In due course, an announcement of Management's decision regarding exercise of the option on the sulphur properties will be made and will be based on the facts when known."

Thereafter, "in order to get a more thorough evaluation and appraisal of the various ore bodies," GAI agreed with Consolidated (April 13, 1966) to add $10,000 to the drilling program. The next day Behre Dolbear & Company wrote GAI that although "the tonnage possibilities do not favor hope for economically workable deposits," in order to satisfy the desire of GAI and Consolidated "to make certain that nothing is missed," they would "continue to explore the property by drilling and bulldozing."

Upon advice of the mining experts, GAI, unwilling to make further expenditures, agreed to permit Consolidated to continue drilling for the next two months.

The press release of April 27, 1966 announced that "additional drilling and exploratory work is now being carried on by the Mine owners on the 340 acres of sulphur-bearing deposits in California under option to Great American, but results on this work will not be available for about 60 days."

On April 28, 1966 a more detailed statement was made that "with regard to the California sulphur claims on which Great American acquired the purchase option in January, 1966, the engineering firms of Behre Dolbear & Co., and Arthur D. Little, Inc., have reported to the Company that their investigations of the claims have not indicated sufficient promise of commercially mineable ore bodies to justify further expenditure by Great American on such investigations. Consequently, the Company has terminated the work by these engineering firms and will concentrate its efforts on the Nevada claims. As previously announced, the owners of the California properties will continue exploratory work at their own expense and extended Great American's option purchase for an additional 60 days. The Great American management will consider any additional findings which the mine owners may develop and submit to it."

The finale of the Consolidated option resulted from a disagreement between GAI and Consolidated and the peremptory demand that GAI exercise the option by May 25, 1966. GAI did not do so.

Thus, as to Consolidated property, the record supports the accuracy of the releases of January 13th, April 12th, April 27th, and April 28th as well as the 8-K information. After reviewing the facts (almost all of which were documented) at length, Judge Ryan concluded "On these undisputed facts, it is difficult to find support for the Com-

mission's charge that on the California transaction, the defendants were guilty of misleading and false statements in the 8-K forms or in their press releases." More affirmatively, the Court found the 8-K report and the press release to be "true and accurate." Certainly there is no basis for the reversal of this solidly supported finding.

*The Arizona Property*

Mack heard of an Arizona copper property in February or early March 1966 from its owner, defendant Tom Beard, who submitted two reports thereon, dated September 1965 and January 1966. Arthur D. Little, Inc. was employed by GAI to evaluate the property and submitted its report, dated March 18, 1966. Significant are two comments: "Our study has resulted in the conclusion that the property is fairly and honestly reported in Mr. Beard's reports dated September 17, 1965, and January 1966." and "We believe that there is sufficient evidence to indicate a potentially promising ore deposit." The report recommended that GAI proceed with a "further evaluation" in specified steps and that Beard's request for a $50,000 down payment was justified. Little's judgment of Beard was: "We are impressed with the knowledge and sincerity of Mr. Beard and feel that an association with him would be advantageous from your point of view if you are interested in mineral industry investments."

On March 21, 1966, by letter agreement, GAI obtained from the owner Beard (Basin Mining Company) a 60-day option to purchase the property (480 acres) from him for $50,000 and 200,000 shares of GAI stock "to be issued to you [Beard]." Contrary to the Commission's position that the stock was to be obtained "by these defendants," no recipient other than Beard (Basin) is mentioned in the contract, and no stock was to be issued to anyone else. $50,000 were to be paid to Beard upon the signing of the option and $75,000 worth of mining machinery was to be transferred to GAI's account.

Beard was the sole owner of Basin Mining stock. He had entered into a joint venture agreement with Pagnani and Matusow which provided for their sharing in mining properties owned by Beard on a basis of $\frac{4}{6}$ to Matusow and $\frac{1}{6}$ each to Pagnani and Beard. The Court, however, found that "There is no evidence that the corporate defendants knew about this private agreement, * * *" and that "there was nothing false or misleading about the 8–K report or the press release to this effect [i. e., that Beard was the owner and the price was 200,000 shares]. As for other charges of falsity, the Court noted that the Commission was criticizing "Mack's business judgment in following the four reports of his experts," the criticism being based on an affidavit by the Commission's Chief Mining Engineer who did not share the opinion of the others. The Court concluded that this "does not mean that the corporate defendants were guilty of false or misleading statements in adopting the views of their experts."

In the press release issued on the same day (March 21, 1966), Mack announced the acquisition of the option, that further investigations would have to be made to appraise the property and its reserves, that he was advised that the mine could be in production within 90 to 120 days but that at that time "he was unable to estimate the earning potential of this property." The advice to Mack was confirmed in writing by Beard (April 5th) to the effect that the installation would take 90 to 120 days to complete and that concentrate shipments to the Inspiration Smelter and Refining Company should begin within 30 days.

Under date of March 28, 1966 Mack received an additional report from a chemical engineer whom he had retained which, in substance, stated that surface exposures acceptable for "indicated and inferred calculations" were "more than adequate to justify an extensive investigation of the property" and that "Based on the indications [the property] could represent an extremely extensive ore body."

On March 31, 1966, Mack submitted this report to the Executive Committee of the GAI Board (the Board had previously reviewed the Beard and Little reports) and recommended exercising the option and making a supervisory management contract with Beard, who was to purchase machinery to put the mine into operation within 90 to 120 days "in a small way and continue to develop it and prove it up until the Board of Directors may at some future time feel it is safe to arrange the larger financing for operating it on a much larger scale," Mack saying, "This eliminates any serious risk to Great American Industries by this procedure."

On April 12, 1966 Mack by press release publicly reported these developments, including a Commission order of March 31, 1966 suspending trading of GAI stock, and stated in part, "It is not known whether or not there is a commercially mineable ore body at the property." He referred to limited exploratory work and an intention to explore further, including the construction of a small mill within four or five months "despite the fact that it is not now known whether or not there is a commercially mineable ore body at the property." Mack also stated with respect to rumors of rich strikes that "The Company has not been responsible for these rumors—and the Company disavows them."

Mack's statement in the April 27th release that "machinery and equipment was now being ordered which should put this property into production in about 90 days," and its qualification the next day (April 28th release) that the 90 days' expectation was not to alter the April 12th statement as to the uncertainty of commercially mineable ore were based upon reasonable expectations supported by proof upon which the Court was entitled to rely.

The Commission selects this statement in the April 27th release and labels it "false" but the record reveals that when this statement was made, Mack had the written commitment of Beard (April 5th) to this effect.

### The Nevada Property

On April 18, 1966, Mack heard of a Nevada sulphur property. He and Behre of Behre Dolbear & Company, mining and geological consultants, visited the property. Under date of April 25, 1966,[1] Behre presented to Mack his written appraisal based upon a preliminary examination, in which he subscribed to the opinion that by adequate exploratory drilling, double the quantity of sulphur ore claimed could be obtained. This property was apparently owned by three companies—Crofoot Lumber Co., Commonwealth Silver Co., and Canyon State Mining Co., which formed Pacific Sulphur Company for the sale to GAI. The original price was to have been 300,000 shares of GAI stock and a royalty payment of $4,500,000 to Crofoot. On April 22, 1966, GAI agreed to purchase the property from Pacific Sulphur for 300,000 shares of GAI stock. Under the agreement, Canyon State was to receive 41,330 shares, Commonwealth 41,330 shares, Crofoot 17,340 shares, Matusow who guaranteed $250,000 in cash to Crofoot 134,000 shares, 33,000 shares to Pagnani, and 33,000 shares to Beard.

The purchase price to GAI of this property was 300,000 GAI shares for the selling group. The majority characterize the division of the stock amongst the sellers as a "peculiar division of the consideration" but query, is a federal court years after the event to dictate what the sellers chose to do with the proceeds of their sale?

On April 27, 1966, Mack announced the acquisition for 300,000 shares. A lawsuit against the sellers to enjoin the sale caused a change in the contract which, as altered, called for a radical change in their *inter sese* arrangements as to stock allocation, an assumption by GAI of the Crofoot guarantee, and an undertaking by Canyon and Commonwealth to join with GAI in a sharing of further exploration costs.

---

1.  Mack's affidavit states the report to have been given on April 22nd.

These are the facts underlying the negotiations with respect to each of the three properties. They are supported by letters and other documents. The various press releases accurately reflect these facts. In summary, Judge Ryan was solidly buttressed by "undisputed facts" when he held (1) as to Consolidated that "it is difficult to find support for the Commission's charge that on the California transaction the defendants were guilty of misleading or false statements in the 8-K forms or in their press releases."; (2) as to Arizona that "There was nothing false in the press release of April 27, 1966, reporting the ordering of machinery and equipment in order to put the property into production. This was entirely true, for Mack had entered into such an agreement with Beard on April 5, 1966."; and (3) as to Nevada that there was no "failure to disclose the true purchase price demanded by the sellers."

In the face of these undisputed facts, how does the majority reach its result? Abstaining from dealing with the documented facts, they prefer to characterize the papers before Judge Ryan as a "disorganized record," and believe that some knowledge (they do not say what) possessed by the corporate officers was "critical" and that despite the letters and documents, the officers should have been seen and heard. Why or for what purpose, since these facts were undisputed, they do not disclose.

The majority satisfy themselves with their own finding (thereby saying, in effect, that there was no sufficient evidence to support Judge Ryan's contrary finding) that "the deficiencies in the press releases and reports were not merely negligent, * * * but something more." What "more" they do not choose to reveal. However, what little they do reveal will not withstand factual analysis.

They say that the release (March 21, 1966) relating to Arizona "created an exaggerated impression" because Mack stated that "he is advised" [as he was in fact] that the mine could be put in operation within 90 to 120 days. Forced to admit this was "literally true," they indulge in the unsupported (indeed false) assumption that "GAI then had no intention of putting the mine into production unless the additional investigations during the 60-day period of the option showed that this would be warranted." The fact that another release some three weeks later (April 12th) also accurately stated the then status of the exploratory work does not make the March 21st report either misleading, false or deficient.

No proof was produced by the SEC that the anticipation mentioned in the April 12th release was not based on reasonable premises. That the SEC may have preferred to allay any optimism or hopeful anticipation (in contrast with their criticism of "gloom" in *Texas Gulf Sulphur*) does not make GAI's acquiescence an admission of guilt. As Judge Ryan quite properly said:

"The fact that the corporate-defendants modified the wording of the 8-K Form on the day following at the urging of the Commission is not an admission of guilt but rather the act of prudent businessmen to avoid unnecessary conflict and perhaps litigation with a Government agency charged with regulating their activities."

*Allocation by the Sellers, Consolidated (California), Beard (Arizona) and the Nevada Group of the GAI stock received or to be received for their Properties.*

Unable to find the necessary proof to refute Judge Ryan's findings, the majority tread upon "new ground" "to impose on sellers of property * * * a duty of full disclosure to a buyer issuing securities in exchange" and place upon the buyer the duty "to publicize the material facts so disclosed." Here is indeed an astounding proposition of law.

Out of all the SEC charges relating to the sellers' distribution of the proceeds, the majority concede that they "must be limited to the Nevada property." Even as to Nevada, the majority confuse the question of value and the fairness of the purchase price with the

question of distribution of the purchase price. This conclusion is evident from the majority's unfounded assumption that GAI might have been "taken" and the mine might not have been "worth anything like what GAI was paying for it." But the SEC does not challenge worth. This confusion is made more evident by the majority's hypotheses that 300,000 shares of GAI stock were worth $3,000,000 and that the owners "were in fact receiving only $1,200,000." The fact that others were designated to receive $2,400,000 is unrelated to the value of the property acquired. No proof was submitted to Judge Ryan, and no claim is made by the SEC that the property did not have this value.

Despite the majority's concession, the situations in Consolidated and Arizona point to the extremes to which the SEC presses its pointless point.

*Consolidated (California)*

Although this transaction was not consummated, the SEC charges that of the 1,600,000 GAI shares to be paid "the defendants Matusow, Lester and Seagraves would have received 600,000 of the 1,600,-000 shares even though they contributed no property or services of any economic value other than the services they allegedly rendered as 'finders' in this transaction." Again, the facts completely rebut even an inference that these defendants were to contribute property or services to GAI. The owner of the property was Consolidated of which Porter was the President. The contract (January 11, 1966) provided that the owner, Consolidated, would receive 1,-600,000 shares of GAI stock. No property or services were to come to GAI from Matusow, Lester or Seagraves, and nothing was to be paid to them by GAI.

The proof shows that the California property, owned by the Consolidated Sulphur Company, came to the attention of Matusow through Lester. Lester apparently had an oral agreement with Kenneth Porter, Consolidated's President, and Seagraves, to buy the property. Lester agreed with Matusow that if he (Matusow) could sell the property upon terms statisfactory to Consolidated, Lester would receive a portion of the fee paid to Matusow. Seagraves was represented as a principal stockholder of the owning company. Lester's participation in the deal was limited to his personal agreement with Matusow. Thus, Seagraves and Lester can in no sense be termed "finders" as they had no relationship, contractual or otherwise, with GAI.

There is no evidence, and the SEC does not so contend, that the price for the property was not fair or that the bargaining was not conducted at armslength. The SEC argues that what the seller intended to do with the proceeds of its sale should have been disclosed. But even the SEC is forced to concede that "there is no direct evidence that Mack or any of the other corporate-affiliated defendants had knowledge of the large finders' fees involved in the California transactions." The Commission would infer such knowledge. However, Judge Ryan found to the contrary. Assuming inferable knowledge, the Court's conclusion that "What the seller of the property intended to do or had bound himself to do with them [the proceeds of the sale] played no part in the transaction.", is unassailable as a proposition of law.

The failure of Mack to disclose that which the Court has found he did not know or a failure to cross-examine the seller as to his intended distribution of the proceeds could not possibly be violations of any section of the Securities Exchange Act.

*Arizona*

Beard was the sole owner of Basin Mining stock. He had a joint venture agreement with Pagnani and Matusow which provided for their sharing in mining properties owned by Beard on a basis of ⅘ to Matusow and ⅒ each to Pagnani and Beard. The Court found that "There is no evidence that the corporate defendants knew about this private agreement, * * *" and that "there was nothing false or misleading about the 8-K report or the press release to this effect [i. e., that Beard

was the owner and the price was 200,000 shares].

When, as and if the Beard property were sold, Beard, quite independently of Mack or GAI, had on March 10, 1966, entered into an agreement with Matusow and Pagnani whereby Beard, the owner, transferred two-thirds of his interest therein to Matusow and one-sixth to Pagnani. Matusow and Pagnani were to "undertake to help promote various mining properties with the view towards a possible sale to private and/or public companies  *  *  *" There is no proof that GAI or Mack participated in negotiating or consummating this agreement. The actual agreement for the purchase of the Arizona property dated April 5, 1966, called for the delivery by GAI to Beard, as owner, of 200,000 shares of GAI stock. GAI did not issue any stock to anyone else as a "finder" or otherwise. Neither Matusow nor Pagnani were under a duty to advise GAI stockholders or the public as to their private agreement with Beard or the reasons why Pagnani agreed to perform legal services as an attorney for a one-sixth stock interest in the event stock were received as the result of any future transaction.

*Nevada*

Here the majority deviates so far from the facts that any conclusions based thereon become completely irrelevant to this case. Pacific Sulphur was in fact representing Crofoot, Commonwealth, and Canyon State. The identification of Pacific Sulphur without listing the names of other parties represented by it cannot rationally be distorted into a failure to disclose a material fact in which GAI stockholders might be interested. Were the value to be misrepresented, there might be some basis for complaint but no such claim is made. Again the majority make an assumption that GAI's "willingness to pay intermediaries two-thirds of the price  *  *  * is so unusual" as to raise a question as to the value of the mine. The only difficulty with the assumption is that it is false because (1) the others were not "intermediaries" being paid by GAI for effecting the sale; and (2) no question of the value of the mine is raised—even by the SEC.

Consider for a moment the consequences of the majority's statement that "It must be conceded that imposing on sellers of property or finders a duty of full disclosure to a buyer issuing securities in exchange, with a consequent duty on the later to publicize material facts so disclosed, would increase the protection afforded investors and traders by the securities laws." Were this the law, or to be the law, no acquisition of property for stock could safely be made. For the buyer to be safe, he would have to obtain from the seller a statement of any and all obligations which the seller might have in connection with the sale, any finder's fees for which he might be liable, a description of the intended distribution of the proceeds and the reasons justifiable at a later date to SEC and federal courts for such distributions. In addition, he would have to refrain from any business transaction involving acquisition of property for stock until he had obtained from the seller the information just mentioned. And he would be forced to discontinue negotiations, no matter how advantageous the deal might be to the stockholders, if the seller refused to disclose his own private affairs by a curt "None of your business." In any event, the business wisdom of seller and buyer could always be attacked by the Commission at some future date if its business judgment differed from that of the parties.

In all three transactions, the positions of buyer and seller are clear as a matter of law and fact. The buyer and seller must agree on a price (here consideration is not in issue). The buyer will desire to be assured that he is receiving good title to the property purchased. If stock is to be issued, he will want assurances which will enable him to determine whether the stock must be registered or is exempt therefrom under the law. The seller's interest will be in ascertaining whether the stock has been validly issued by the purchaser. And in

any business transaction, the purchaser will wish to know whether any brokerage or commissions are involved for which he might be liable. However, here there are none.

Under the Commission's theory, many interesting questions would be presented. If the seller were to consist of a syndicate of twelve individuals or companies, must each of the twelve disclose and justify the syndicate agreement between them made, as in two instances here, before and quite apart from these transactions? If the seller by previous agreement of divorce had undertaken to give half of his property to his ex-wife or possibly with less uxorial compulsion one-third to each of three children, must such an agreement be disclosed? What possible materiality would there be insofar as the value of the property might be affected? Certainly, such recipients (wife or children), to use the Commission's allegation, would have "contributed no property or services of any economic value." But there is no requirement in law that the donees or business associates of the seller make any such contribution. With complete *non sequitur* argument, the SEC states that the allocation between the sellers and those working with them as "finders" is material because "it tends to show, first that the seller was prepared to take far less for the properties than GAI was paying for them and, secondly, that the seller was sufficiently anxious to find a buyer so that he was willing to pay disproportionate compensation to anyone who produced a buyer." No proof whatsoever supports these wholly unwarranted assumptions.

As to the first proposition, there is no proof that the price in GAI stock was not the result of fair arm's-length bargaining. The Commission does not claim otherwise but would explain such lack of proof by the statement that "No one can prove the value of a largely unexplored mining project." But there is no justification for then assuming that the seller's personal arrangements for distributing the sale proceeds had any relation to the true value of the properties or affected in any way the selling price. Furthermore, there is no proof that any of the sellers misrepresented or exaggerated the worth of the properties sold for GAI stock.

In addition, in its pleadings and arguments, the Commission has used misleading terminology to describe the defendants not associated with GAI. In the complaint as to the Arizona property, the Commission refers to Matusow, Pagnani, Lester and Seagraves as being compensated for "services they allegedly rendered as 'finders' in this transaction." The same allegation is made against Matusow, Pagnani and Beard as to the Nevada property and against Matusow, Lester and Seagraves with respect to the California property. Affirmatively, the proof is clear and convincing as to the actual status of each of these defendants.

Although Matusow and Beard brought the Nevada property to GAI's attention in April 1966, there is no evidence that they were to receive stock as "finders." In fact, Judge Ryan found that pursuant to a joint venture agreement, Beard and Matusow contributed sales services, and Pagnani contributed legal services. The original agreement provided for a sale price of 300,000 shares plus $4,500,000 in royalties to Crofoot, one of the three owners of the property. Matusow, who received 134,000 shares under the joint venture agreement, guaranteed that the 17,340 shares received by Crofoot as its share of the purchase price would be worth at least $250,000. When the contract was renegotiated, this guaranty was assumed by GAI, and Matusow's commission was reduced to that received by the other members of the joint venture. Initially they were to receive 33,000 shares each, but since the renegotiated deal was less favorable to the sellers, they agreed to accept 15,000 shares each for their services, leaving the purchase price unchanged. The court below found that "the charge that the Nevada agreement was redrawn in order to conceal the fraud on GAI falls by reason of our finding that there was no fraud and

also of its own weight." The record amply supports this finding.

As to the second proposition, from the viewpoint of GAI and the welfare of its stockholders, it would scarcely be in order for the SEC or the courts to make it a condition of every corporate acquisition that the state of mind of the seller, his financial condition, his motive for selling and the adequacy of the price be made the subject of pre-sale inquiry by the SEC. Apparently, Beard, the owner of the Arizona property, needed $50,000 in cash to liquidate a bank debt personal to him. This need may have prompted him to enter into his own agreement with Matusow and Pagnani (Agreement, March 10, 1966). This agreement, however, was quite collateral to the sale-option agreement of March 21, 1966 between GAI and Beard, whereby Beard received the $50,000 for the option—in fact, as to GAI and its stockholders of no relevance whatsoever. If economic pressure motivated his offer and price, it is not for the Commission or the courts to pry into his reasons.[2]

Particularly disconcerting to one who believes that decisions should be based on fact—not fiction—is the judicial willingness as evinced in the majority and concurring opinions not only to distort the facts but also to create for their own purposes hypothetical facts for the existence of which not one iota of proof exists. Typical are such statements as "in the Arizona affair * * * the finder defendants received exorbitant fees for the performance of minimal services.", and that such fees would "clearly have indicated the property could not be worth the price paid." But there were no fees paid, exorbitant or otherwise. The distribution of the proceeds by the seller was pursuant to a pre-existing joint venture agreement wholly unrelated to GAI. As to the "worth" of the property being affected by the joint venture agreement, not even the SEC questions the propriety of the price paid or the value of the property.

Equally disconcerting is the pronouncement of a proposition of law that GAI's officers were aware (an assumption contrary to fact) or should have been aware that finders' fees [there were none] were to be paid and that they were "under an obligation to inquire of the sellers of the property as to what part of the stock issued to them would be paid out as finders' fees and to report this information to the GAI board of directors and include it in press releases and reports." To say that "The finders who were to share in the excessive finders' fees were also under a duty to inform the purchasers of the property of the amount of the fees." is to place every business and real estate broker in jeopardy unless he (probably in violation of his duty to his principal) advises the prospective purchaser, and if a corporation the stockholders thereof, and the SEC of the business arrangements existing between him and his principal. Only an Alice in a legal Wonderland could conceive of any such proposition.

Officers and directors of corporations are charged primarily with corporate management. If they so mismanage the corporation that damage results to it, the law provides adequate remedies. Congress has not as yet vested in the Commission general supervision over corporations and the business judgments exercised by their officers in conducting their affairs. And so here, the wisdom of GAI and its chief executive officer in seeking to expand in the field of natural resources was a matter of business judgment. How the judgment was exercised was within the area of internal management. But what GAI and its officers said to its stockholders and to the public, if calculated improperly to affect the price of the shares and public trading therein, would very much be a concern of the Commission. The limits of this concern, however, have been outlined by

---

2. History records an offer seemingly quite abnormal, namely, a kingdom in exchange for a horse and yet as events proved such a bargain, had it been consummated, would (momentarily at least) have been highly desirable for Richard III.

the Congress in its enactment of Section 10(b). The language states the protective purpose, namely, to safeguard the public and investors against "any manipulative or deceptive device or contrivance in contravention of * * * [Commission rules and regulations appropriate for such protection]." 15 U.S.C. § 78j(b). The Commission's understanding of its role is evidenced by the heading of its Rule 10b–5 (17 C.F.R. § 240.-10b–5) "Employment of Manipulative and Deceptive Devices." Subparagraphs (1) and (3) expressly deal with fraud. Paragraph (2), the key paragraph relied upon here by the Commission, relates to "untrue" statements of "material" facts or the "omission" of such material facts as would be necessary to make the statements "not misleading."

The Commission, of necessity, must as a rule make its investigations after the event. In this case, the warning signals were an increase in price and an increased volume of trading in a low-priced stock [GAI] over a four-month period. These facts alone might be of little significance in an age in which the slightest rumor of some electronic or equally glamorous-in-the-public-mind discovery has caused scores of publicly listed securities to register fantastic percentage gains.[3] Nevertheless, cause might well be investigated. But without tangible proof of fraud, manipulation or deception, price increase cannot be considered as presumptive evidence thereof.

The record shows that Mack has had a successful and distinguished business career, and is a well-known figure in the corporate and financial field. This, too, is a factor which the court below was entitled to consider. This very fact leads to further consideration of the press release problem. Had a release announced "GAI Acquires Walter S. Mack, Prominent Executive, as President. New Managerial Polices Expected," the investing or speculatively-minded public, confident that his former successes would be repeated, might well have caused a substantial increase in trading volume of GAI and a corresponding increase in price. The following week, a GAI press release might have read, "Mack, new GAI President, announces that he believes future of America lies in its wealth of natural resources. Hopes to acquire mining properties." Thousands, who shared the same beliefs as to our national and natural wealth and with confidence that such an executive would surely succeed, might have determined to entrust their financial future to GAI and, thus, further increase the volume and the price. And if a stock starts from a very low price base, the resulting increase percentage in volume and price may well be phenomenal. But just as the millions spent by the giant oil and mining companies with their supersonic electronic devices for probing Nature's most inaccessible areas cannot guarantee against the drilling of dry holes or the failure of a promising vein, so here Mack might well have failed to live up to expectations. Expectations not realized frequently result in lamentations, lamentations in complaints, and complaints in investigations and lawsuits. In retrospect, it might have been better for the press releases to have read, "Mack, successful in corporate management, new head of GAI, but former success no assurance of future results.", and "Mack plans to acquire natural resources but there have been many mining failures since Goldfield-Tonopah days." Certainly these two statements would have been necessary if the accusation of an omission of material facts were to be avoided. And yet the SEC in a *Texas Gulf Sulphur* mood might well have said that in view of the mining experts' favorable reports, optimism should have been radiated rather than gloom.

In matters of probing the earth, it is difficult—if not impossible—to know what to announce. Certain it is that nei-

---

3. A glance at the financial section of the New York Times of stocks listed (as is GAI) on the American Stock Exchange (price range 1966) reveals scores of stocks with price fluctuations and price increases of several hundred percent.

ther courts nor commissions are sufficiently omniscient to formulate the perfect announcement. If optimism is expressed, thus raising the market price, followed by disappointment, the optimism will be considered false; if pessimism is voiced, depressing the market price, and prosperity follows, this announcement would be equally false. In the electronics field, apparently the mere announcement of the manufacture of some gadget that hopefully will be a part of some device, which will reach some planet other than our own, will send the stock (momentarily at least) almost as high. If the forces of speculative gravity cause the stock to descend, why should the press release not have warned the public that management was not absolutely sure that the device might not be as good as originally expected?

Although the decisions in Securities and Exchange Commission v. R. A. Holman & Co., 366 F.2d 456 (2d Cir. 1966) and List v. Fashion Park, Inc., 340 F.2d 457 (2d Cir. 1965), cert. den. sub nom., List v. Lerner, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965) are relied upon by the Commission in support of its speculation as to what "a reasonable man would attach importance * * * in determining his choice of action in the transaction in question," [4] neither case affords precedence or guidance for the problem in issue here. *Holman* was strictly a case of factual misrepresentation by a customer's man of financial information which might well have materially affected the value of the stock and the customer's decision to buy it. The case was summarized as "a high-pressure sales campaign relying in substantial part on materially misleading statements and omissions," justifying an injunction against "further violations of the federal securities laws" (Id. 366 F.2d at p. 459).

Of a similar character was Berko v. SEC, 297 F.2d 116 (2 Cir., 1961), in which a salesman touted a stock of which he had no real knowledge and made completely unfounded representations.

In *List*, the plaintiff was the owner of 5,100 shares of Fashion Park, Inc., which he had purchased for $13.50 per share in January 1959. On November 11, 1960, with the advice of his broker, he offered this stock for sale at $18 per share. On November 16, 1960, plaintiff's broker invited a defendant, H. Hentz & Co., to purchase the stock at $20 per share. The next day the sale was consummated to Lerner, a director of Fashion Park, and other defendants, at $18.50 per share. The plaintiff did not know, nor was he informed, that Hentz was the broker for the director-purchaser or that Fashion Park Management was considering the sale of the company. Negotiations, which had begun on November 22, 1960, culminated on February 3, 1961, whereby Hat Corporation of America offered $50 per share to Fashion Park's minority stockholders. The plaintiff, feeling aggrieved by his $5 per share profit, instead of the potential $36.50 per share profit, claimed that the defendants "had failed to disclose to him material facts in their possession which would have affected his decision to sell the stock" (340 F.2d p. 460). This court there reviewed the cases and texts bearing upon the decision and affirmed the findings of the trial court that the facts known by the purchasers were too remote to have influenced the conduct of a reasonable investor. At the same time, the court recognized the principles codified in section 10b–5, namely, to penalize fraud or sharp dealing of the type disclosed in Speed v. Transamerica Corp., 99 F.Supp. 808, 828–29 (D.Del.1951), aff'd, 235 F.2d 369 (3 Cir., 1956). Thus, *List* presented a case of an actual transaction between a buyer and a seller where the buyer might well be said to have made a decision not to sell had he known the facts which developed a few days after he had concluded his sale. The facts presented here do not bear even a remote similarity to the situation in *List*.

Speed v. Transamerica Corp., supra, presented a typical case of the majority stockholder having inside information

[4]. Actually a quotation from the Restatement, Torts § 538(2) (a).

taking advantage of minority stockholders by purchasing their stock without revealing information which would definitely have affected their judgment as to selling at the offered price.

The improper use of inside information is illustrated in SEC v. Capital Gains Bureau, 375 U.S. 180, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963). The publisher knew that the recommendations of his financial service were likely to cause at least a temporary increase in the price of stocks favored. Therefore, to buy these stocks for his own account to reap the benefit of such increase was a violation of section 10b–5.

The fundamental purpose of section 10b–5 and the distinction between fraudulent, manipulative or deceptive practices and instances of corporate mismanagement was recognized in Birnbaum v. Newport Steel Corp., 193 F.2d 461, 464, cert. den. 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952) where this court stated that section 10(b) "was directed solely at that type of misrepresentation or fraudulent practice usually associated with the sale or purchase of securities rather than at fraudulent mismanagement of corporate affairs * * *."

*Birnbaum* was thereafter cited and followed by this Court in O'Neill v. Maytag, 2 Cir., 339 F.2d 764 (1964).

Likewise in Ruckle v. Roto American Corporation, 339 F.2d 24 (2 Cir., 1964), the majority directors caused the corporation improperly to issue its stock to one of their number to perpetuate their own control without disclosure of the facts to the entire board.

The Commission's argument concerning omissions and misstatements in the press releases presents many problems. Obviously, the Commission would not urge that any statute, rule or regulation (at least at the present time) requires that press releases be submitted to the Commission for approval before release or that they be as comprehensive as a prospectus. Of necessity, releases frequently must be brief and, hence, cannot contain all the facts. By way of illustration, a company announces "This Company has today received a $100 million order for war material from the Government." A prospective stock purchaser might well believe that such an order would result in substantially increased profits for the company and, as a result, make his purchase. A contract for such a purchase undoubtedly would be a multi-page document. Would it be misleading not to print the entire contract? As a practical matter, no newspaper would do so as a news item. Should the Company warn the public that a cancellation clause permitted Government cancellation in the event of cessation of hostilities; that a renegotiation clause might affect the ultimate purchase price; or that increased labor costs might materially reduce profits? Yet such possibilities could be material factors in assessing the value of the contract. Furthermore, materiality will vary with the individual. The person who does not have even a grammar school education probably would react quite differently than the holder of a doctorate in economics. Psychology will also be a factor. For every purchaser of stock there must be a simultaneous seller. Their points of view would be as far apart as the poles. The purchaser would be an optimist as to the future of the company; the seller a pessimist. When the optimists outnumber the pessimists in their orders on the Exchange, the stock would most likely rise; if shares are unloaded by pessimists in excess of current purchase orders, a decline would be expected. The philosophy of the stock market and the causes of its ups and downs have been the subject of learned treatises and speculations by the experts since time immemorial. But the philosophy for courts and commissions should be that they stay within their respective jurisdictions. They exist to protect the public from "manipulative and deceptive devices" including the omission or misstatement of material facts in press releases issued in connection with securities transactions, and hopefully they can recognize (although not here) the dif-

ference between information that should be revealed because of its importance to a reasonable investor and information which, while possibly of interest to a speculator, is irrelevant to a reasoned investment decision.

The Commission objects to the following standard of materiality used by the District Court:

> "It is essential that the concealment, omission or untruth be of a material fact. This means that the fact concealed or omitted influenced or should have influenced the issuer in its decision to issue the stock in question, or would under the circumstances influence a buyer in the market." 259 F. Supp. at 109.

The Commission argues that this is a "subjective test" requiring it "to establish not materiality but reliance." While the word "influenced" by itself is unclear, the addition of the phrase "or should have influenced" makes it clear that the court was using an objective test of materiality. In any event, I would find, using an objective standard,[5] that the seller's distribution plans were not material, and that there were no omissions or misstatements of material facts

justifying the grant of a preliminary injunction.

*The Temporary Injunction*

In the relief granted, the majority reach the apogee of misuse, in my opinion, of injunctive power and thereby deprive the defendants of normal rights to say nothing of their constitutional rights. They are placed under a "temporary" injunction. Temporary until when? Without a date, it can be perpetual. Injunction against what? Against violating the law with respect to stating facts or omitting to state facts regarding securities transactions. What facts or omissions? Such facts or omissions as the SEC in its unrestricted (subject of course to court review) judgment may at some future date so determine in the light of hindsight.

Consider, as is essential, the effect of the injunction against each defendant.

*Pagnani*

Pagnani is a lawyer. He performed legal services for Matusow and Beard. His fee arrangement with his clients was that his compensation was to be paid in stock (by agreement ⅕ of the shares received by them)—a not unusual arrangement between attorney and client.

---

5. As we read the cases, a fact is material if it would be important to a reasonable investor because of its relevance to the intrinsic value of a company. See S. E. C. v. R. A. Holman & Co., 366 F.2d 456 (2d Cir. 1966) ; Rogens v. Ilikon Corp., 361 F.2d 260, 266 (1st Cir. 1966); List v. Fashion Park, Inc., 340 F.2d 457, 462 (2d Cir. 1965), cert. denied sub nom. List v. Lerner, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965); Hafner v. Forest Labs, Inc., 345 F.2d 167, 168 (2d Cir. 1965); Kohler v. Kohler, 319 F.2d 634, 642 (7th Cir. 1963); Cady, Roberts & Co., 40 SEC 907, 911 (1961); Rest. Torts § 538(2) (a) (1938); Prosser, Torts 734–36 (3rd ed.1964); Harper & James, Torts 565–66 (1956). See generally Bromberg, Securities Law: Fraud § 8.3 (1967); Note, 55 Georgetown L.J. 664, 671, 682–86 (1967); Ruder, Corporate Disclosures Required by the Federal Securities Laws: The Codification Implications of Texas Gulf Sulphur, 61 Nw.U.L. Rev. 872, 885–88 (1967); 3 Loss, Securities Regulation 1463 (2d ed.1961).

In addition, with respect to publicly-traded corporations like GAI the materiality of a given fact will be affected by the probability that disclosure of that fact will have a substantial market impact. See Hafner v. Forest Labs, Inc., supra. We approve the following statement by Arthur Fleischer in Securities Trading and Corporate Information Practices: The Implications of the Texas Gulf Sulphur Proceeding, 51 Va.L.Rev. 1271, 1289:

> "It is appropriate that management's duty of disclosure under rule 10b–5 be limited to those situations which are essentially extraordinary in nature and which are reasonably certain to have a substantial effect on the market price of the security if disclosed. A more rigorous standard would impose an unreasonable burden on management."

However, "substantial market impact" means a substantial change in the price of the stock for an appreciable period of time, not a momentary change of an ephemeral nature.

In complete violation of the attorney-client privilege, the injunction would require Pagnani under penalty of court contempt to disclose all his fees in any transaction involving securities. But disclosure to whom? It would be presumptuous for GAI to ask, or demand to know, how much the seller was paying his attorney. Is a rule of law hereby being created that every attorney, under pain of committing "common law fraud," must reveal to the purchaser the amount of the fee he is receiving from his client, the seller? And lastly, how could the amount of a seller's legal fee possibly be material to those who choose to buy or sell the purchaser's stock? If the price of the purchase be fair (and it is not questioned here) for the commodity purchased, whether it be a mining property, cold rolled steel, or a trainload of grain, the legal fee paid by the seller to his attorney for drawing the contract not only is personal between attorney and client but would not even be an element which would affect the fairness of the transaction.

Yet the majority, in effect, now tell Pagnani that they single him out as an attorney who henceforth accepts legal fees in stock at his peril unless he tells the buyer the amount of his fee and forces the buyer (how I do not know) to include it in an 8-K report. But why is stock different from cash? If the client received $600,000 and paid Pagnani $100,000, is Pagnani under a duty to exhibit his check to the buyer, examine the next 8-K report, and if does not appear therein, advise the SEC that there has been an omission of a material fact? The buyer would undoubtedly take the position that the fee paid by the seller to his attorney was of no interest to him. Sufficient refutation of the majority's newly created legal theory should be found in a *reductio ad absurdum* approach.

*Beard*

Placing Beard under injunction deprives him of engaging in any business transaction for the sale of any of his properties, past, present or future unless he discloses any and all business arrangements in connection therewith as well as his contemplated use of the proceeds. His private contract with Matusow and Pagnani arose out of his personal situation with respect to his $50,000 bank loan. However, future emergencies may well force Beard to contemplate business arrangements which some future court or the SEC in their overriding business judgments may believe to be "peculiar." The choice would appear to be (1) to proceed at his peril; (2) to try to obtain a declaratory judgment blessing from the courts that they were satisfied with his contractual terms; or (3) a letter from the SEC that subject to many conditions it sees no present reason to object. Again, *reductio ad absurdum* supplies the answer.

*Matusow*

If Matusow were a finder, he certainly was not a finder employed for a fee by GAI. In the only transaction (Nevada) considered by the majority, his involvement was as a participant in the selling group, i. e., Pacific Sulphur. The injunction against Matusow must be read as an interdict against his being a member of any selling group unless he discloses his interest or his fees to the buyer. In this particular case, Matusow would have had to have disclosed the background of his $250,000 guaranty to Crofoot, the reasons therefor and the negotiations with Crofoot, Commonwealth and Canyon State, which led to the divisions of stock in question.

*GAI, Mack, Marren, Stolz*

GAI is one of the earlier so-called "conglomerates," namely, a company acquiring other companies in diversified fields.[6] A general injunction of the

6. Great American Industries, Inc., incorporated October 8, 1928, as Pacific American Associates, Inc., and after changes in corporate title to present name, November 12, 1942.

Corporate Background:
"Company, a venture capital corporation, thru subsidiaries (wholly owned except as noted) makes specialized rubber for industrial and manufacturing

sort imposed here could seriously impair its ability to acquire other companies and place it at a competitive disadvantage. To demand from the seller a commitment as to the seller's proposed use and distribution of the proceeds of the sale would undoubtedly meet with resistance even if the seller knew with exactitude what the use would be. Once the seller had the proceeds, the buyer would have no control of the situation. If, for antitrust purposes, merchandise cannot be sold with prohibited conditions attached, *a fortiori* once the transaction has been completed buyer and seller should be free to enjoy the benefits of their bargain. For the same reasons, injunctive provisions against Mack, Marren and Stolz are wholly unjustified.

The granting of a temporary injunction in this case is contrary to all legal principles recognized in this and other circuits relating thereto. These principles have been expressed as follows:

"* * * the granting of a preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it. * * * To justify the granting of such an injunction there must be a showing of irreparable injury during the pendency of the action. * * * It must also appear that the injunction is required to preserve the status quo pendente lite." Warner Bros. Pictures, Inc. v. Gittone, 110 F.2d 292, 293 (3rd Cir. 1940).

"The award of a preliminary injunction is an extraordinary remedy which will not be granted unless upon a clear showing of probable success and possible irreparable injury to the plaintiffs, lest the proper freedom of action of the defendant be circumscribed when no wrong has been committed."

Societe Comptoir De L'Industrie, etc. v. Alexander's Department Stores, Inc., 299 F.2d 35 (2nd Cir. 1962).

"* * * the plaintiffs failed to make the required 'clear showing of probable success.' Societe Comptoir [supra]." Ames v. Associated Musicians of Greater New York, Local 802, AFM, 359 F.2d 777, 779 (2nd Cir. 1966).

And yet the majority are quite willing to take the record upon which Judge Ryan found the facts sufficiently clear to warrant the denial of an injunction and, despite the clear proof burden, grant an injunction upon this very record which they characterize as "disorganized" and "so unsatisfactory."

### Conclusion

The position taken by the SEC and aided and abetted by the majority is fraught with worrisome consequences. The SEC has advanced "1984"[7] by at least 15 years and casts the ominous shadow of Big Brother over the desk of every executive and over the tables around which directors gather. In a day and age when unreasonable searches and seizures and invasions of privacy give the courts great concern, is it not anomalous that the SEC seeks to pry into the use to which a seller intends to put his sales proceeds? It makes little difference whether it be stock or cash. Is the SEC to have regulatory powers over such use? If so, they should have the power to subpoena every seller to inquire into the intended use of the proceeds. But mere inquiry is of little use unless it can be implemented by some remedy. Using the hypothetical case above-mentioned of a distribution of one-half of the proceeds to a divorced wife, the SEC should be able to decree that the seller's settlement agreement with her was improvident and

uses, franchises others to make canned soft drinks, and, since 1966, makes architectural face bricks, clay, and vitrified clay sewer pipes. In 1966 and early 1967 Co. acquired mining claims on properties containing copper and sulphur, and also acquired majority ownership in a company which had exploration rights on properties containing oil, gas, and sulphur." Standard Corporation Descriptions (Standard & Poor), vol. 29, no. 6, sec. 2 (February 29, 1968).

7. George Orwell, "1984."

that the sale should be cancelled or rescinded unless she agreed to take less. How does such an attitude by an administrative agency differ from that of an agency of a totalitarian dictatorship? In a police state, the agents of an agency do not necessarily wear uniforms. And power can be dangerous. Power to protect—here in theory to protect investors —can so easily be turned into power to oppress. The Congress has not chosen to give the Commission this power—it has been assumed by the Commission. The Commission, in turn, without any showing of threatened danger in the future (in fact, the only transactions involved had been terminated) uses the extraordinary remedy of injunction to place a company, its officers and even individuals unrelated thereto under a sword of Damocles, the thread of which can be cut at any time according to the whim and caprice of agents of the Commission. It is no answer to say that it is only an injunction to obey the law because no standards have been set. The defendants under injunction have no way of knowing what item omitted from a release some agent of the Commission will in the future regard as material. Even a statement to stockholders and the public that a company hopes to do well in 1969 is fraught with danger if these hopes are not realized. And, needless to say, a prediction that 1969 is likely to be a poor year must obviously be a fraudulent scheme to depress the stock. In short, the Commission would have corporations and their executives march in lock step with the Commission in whatever cadence the Commission sets after the march has begun and subject to change at the Commission's exclusive calling. I find it highly anachronistic that in an age when courts and agencies give so much attention to civil rights that rights so much more fundamental (as here) are in my opinion so grossly violated.

Fear and uncertainty pervade corporate and financial officers.[8] And properly so if every utterance is to be made at their peril. Must proposed acquisitions of properties be heralded to the public in advance?[9] If they are and a runaway market thwarts the transaction, are the officers liable for the publicity? If no notice is given, are they to be equally liable for failing to give the public an opportunity to buy?

With the "documented" facts before him, Judge Ryan addressed himself to the only issue before him, namely on these facts would he have been justified in granting a preliminary injunction in advance of trial to prevent the happening of some currently threatened events which would have resulted in irreparable injury. His conclusion that the proof did not call for the imposition of such a remedy is warranted and should not be disturbed.

8. Informal and unofficial though it be, see "Corporate Disclosure and Insider Information"—a Panel Interview. Conference of the Financial Analysts Federation, October 7, 1968.

9. See discussion in Sunray DX Oil Company v. Helmerich & Payne, Inc., 398 F. 2d 447 (10th Cir., 1968), vacating a preliminary injunction.